UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 3:19CR180 (RNC) |
| | : | |
| v. | : | |
| | : | August 26, 2019 |
| FRANK CARR | : | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE

On or about August 8, 2019, the defendant filed a motion to be released on bond. (Doc. 317). A hearing is scheduled before the Hon. Donna F. Martinez on August 29, 2019.

The Government submits this memorandum in support of its detention motion filed on July 10, 2019, and in opposition to defendant's motion.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On or about July 9, 2019, an indictment was returned charging Carr in Count One with a conspiracy from in or about March 2019 to on or around June 3, 2019 to possess with intent to distribute 28 grams or more of cocaine base/crack, and a quantity of heroin and cocaine, in violation of Title 21, United States Code, Sections 846, and 841(b)(1)(B)(iii) and (b)(1)(C).   Carr is also charged in: Count Five with possession with intent to distribute and distribution of cocaine and cocaine base, in violation of Title 21, United States Code, 841(a)(1) and 841(b)(1)(C); Count Six with possession with intent to distribute and distribution of cocaine, in violation of Title 21, United States Code, 841(a)(1) and 841(b)(1)(C); Count Seven with possession with intent to distribute and distribution of 28 grams or more of cocaine base, in violation of Title 21, United States Code, 841(a)(1) and 841(b)(1)(B)(iii); Count Nine with possession with intent to distribute and distribution of cocaine base, in violation of Title 21, United States Code, 841(a)(1) and

841(b)(1)(C); and Count 12 with possession with intent to distribute and distribution of cocaine base and heroin, in violation of Title 21, United States Code, 841(a)(1) and 841(b)(1) (C).   Arrest warrants were issued for all of the defendants including Carr.

On July 10, 2019, Carr was arrested and presented and arraigned before the Hon. Robert M. Spector.   At the time of the initial appearance, the Court granted the Government's motion for pretrial detention without prejudice to an application for bond should the defendant be in a position to propose a bond package.

Based on Carr's charges in the instant case, on July 29, 2019, the United States Probation Office submitted to Judge Thompson a Petition for Warrant or Summons for Offender Under Supervision in Case No. 3:12CR53 (AWT).   On information and belief, on or about August 5, 2019, a warrant was issued by Judge Thompson.

In his motion for bond, Carr asks to be released so he can take care of his ill mother.   He states that he would remain at the residence that Carr shares with Joyce Bellamy where he could also help with Ms. Bellamy's business, as well as helping to care for his mother.   Carr agrees to "close monitoring" and proposes "sufficient monetary bail with the wife [whom he identifies as Ms. Bellamy] willing to put her house up to ensure the Defendant's future appearance in Court."   Carr also cites various medical issues which he claims could be better treated if he were on bond.

For the reasons stated herein, the Government believes that pretrial detention is warranted and that the defendant's motion should be denied.

## II.   **DISCUSSION**

### A.   **Governing Law**

A discussion regarding whether pre-trial detention is appropriate must necessarily begin by reference to the Bail Reform Act of 1984.   *See* 18 U.S.C. §§ 3141, 3142 and 3143.

As an initial matter, Carr is on supervised release and a Petition for Warrant or Summons for Offender Under Supervision was filed on July 29, 2019 in Case No. 3:12CR53 (AWT). Accordingly, "[t]he burden of establishing by clear and convincing evidence that the person will not flee or pose a danger to any other person or to the community rests with the person." Fed. R. Crim. P. 32.1(a)(6).

With respect to the Government's motion for detention on the underlying case, Section 3142(f)(1) of Title 18 provides that detention is authorized where, *inter alia*, there is probable cause to believe that the person committed an offense for which there is a maximum term of imprisonment of ten or more years under the Controlled Substances Act. Pursuant to 18 U.S.C. § 3142(e)(3), subject to rebuttal, where there is probable cause to believe that such an offense has been committed, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." Of course, this presumption may be rebutted, at which point the burden is on the Government to establish by clear and convincing that the defendant poses a danger to the community, *see* 18 U.S.C. § 3142(f)(2), and/or by a preponderance of the evidence that the defendant poses a risk of flight. *See United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (citing *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985)). Section 3142(e)(1) states:

> If, after a hearing pursuant to the provisions of subsection (f) of this section, the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial.

Proof of "either danger to the community or risk of flight is sufficient to authorize detention." *United States v. Sazenski,* 806 F.2d 846, 848 (8th Cir. 1986); *see, e.g., United States v. Jackson*, 823 F.2d 4, 8 (2d Cir. 1987) (holding that court need not consider danger to community

when defendant poses risk of flight); *United States v. Bruno*, 89 F. Supp. 3d 425, 429 (E.D.N.Y. 2015) ("The central inquiry to be performed by the Court is to determine whether the defendant is a flight risk *or* a danger to any other person or to the community at large") (emphasis added).

18 U.S.C. § 3142(g) sets forth the factors to be considered in determining whether pre-trial detention is warranted.    These factors include:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) The weight of the evidence against the person;

(3) The history and characteristics of the person, including –

(A) The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) Whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State, or local law; and

(4)    The nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

*Id*.

In evaluating whether a defendant poses a risk of flight, the court should not rely on any one factor to the exclusion of others.    "Congress requires the court to consider the defendant's history and characteristics, as well as other factors" in determining the flight risk.    *See Shakur*, 817 F.2d at 200; *See also, e.g., United States v. Raniere*, No. 18-CR-204-1 (NGG), 2018 U.S. Dist. LEXIS 103306, at *15-18 (E.D.N.Y. June 18, 2018) (where the court denied a motion for release

on bail because amongst other factors "[d]efendant's history and characteristics strongly support the conclusion that he is a flight risk").    Still, a bail package that might "reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community." *United States v. Mercedes*, 254 F.3d 433, 436-437 (2d Cir. 2001). When determining whether a defendant poses a danger to the community, the court should consider the impact of a defendant's release on the safety of identifiable individuals, such as victims or witnesses, as well as the "danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (internal quotation marks omitted).    Danger to the community is not limited to physical violence but may also include economic harm.    *See United States v. Dupree*, 833 F. Supp. 241, 253 (E.D.N.Y. 2011); *United States v. Madoff*, 586 F. Supp. 240, 251-54 (S.D.N.Y 2011) (citing cases); *United States v. Delker*, 757 F.2d 1390, 1393 (3d Cir. 1985); *see also United States v. Reynolds*, 956 F.2d 192, 193 (9th Cir. 1992); *United States v. Vance*, 851 F.2d 166 (6th Cir. 1988) (discussing detention in a post-conviction context). Indeed, the legislative history of the Bail Reform Act clearly expresses this intent.    *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.").

**B.    The defendant should be detained**

The Government respectfully submits the defendant cannot establish by clear and convincing evidence that he does not pose a risk of flight or danger to the community.    In any

event, there is clear and convincing evidence that the defendant poses a substantial risk of danger to the community and a preponderance of the evidence that he presents a risk of flight.

First, the offenses charged in the indictment are serious.   If convicted on Count One and/or Seven, given the filing of an 851 Notice, Carr faces a mandatory minimum sentence of ten years and up to lifetime imprisonment, and he faces up to 20 years imprisonment on the remaining counts in which he is charged.   Further, these are federal controlled substance offenses, which the statute specifically delineates as a factor in support of detention.

With respect to the nature of the case and strength of the evidence against the defendant, the Government submits that the evidence is overwhelming.   That evidence falls into essentially four tranches.

First, the substantive charges in Counts Five, Six, Seven, and Nine, arise out of purchases of cocaine base/crack cocaine and/or cocaine from Carr by a Confidential Source.   Although the quantities and substances vary, as alleged in Count Seven of the Indictment, on May 23, 2019 alone, the source purchased in excess of 28 grams of cocaine base/crack cocaine.

In his motion, Carr claims he "has some defenses to the Conspiracy Counts," including issues relating to the Cooperating Source (which, parenthetically, would only relate to some of the evidence of Carr's involvement in the conspiracy).   In any event, while Carr may seek to raise these defenses at trial, the Government submits that a detention hearing is not the proper forum to

litigate these defenses.[1]   It is noted that the buys were monitored and recorded by law enforcement.

The second category of evidence involves the charge contained in Count 12 of the indictment relating to Carr's June 12, 2019 sale of cocaine base and heroin to an individual who was arrested shortly after the sale.

In that case, agents monitoring a court-authorized wiretap on Carr's telephone, learned that an individual ("Witness A") -- who had arranged to meet Carr on approximately seven prior occasions -- was again planning to meet.   It was clear from at least one of those earlier conversations that the purpose of the meeting was for Witness A to purchase drugs from Carr (*i.e.*, on May 26, 2019, Witness A asked Carr to "grab a hard for the uh twenty I gave you," which

---

[1]For example, asserting a claim of entrapment may prove to be problematic for Carr given that evidence of his prior record of drug dealing and the other evidence in this case discussed below, all of which would establish that he had a predisposition to engage in drug trafficking.   *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct."); *United States v. Cromite*, 727 F.3d 194, 204 (2d Cir. 2013).   As to a defense of renunciation, the Second Circuit has questioned whether such a defense exists and has further noted that it has "not held 'that withdrawal ends a conspirator's liability for the conspiracy prior to the time of withdrawal,' *United States v. Dallas,* 229 F.3d 105, 110 (2d Cir.2000), and has not adopted the Model Penal Code's defense, *see United States v. LoRusso,* 695 F.2d 45, 55 n. 5 (2d Cir.1982); *United States v. Binday,* 804 F.3d 558, 589 n. 32 (2d Cir. 2015); see also United States v. Crowley, 318 F.3d 401, 410 & n. 3 (2d Cir. 2003) (characterizing defense of renunciation as "somewhat anomalous; ordinarily, once a person has committed acts sufficient to establish criminal liability, his repentance or desistance from further crimes cannot absolve him of guilt.").   Finally, it is unclear how Carr will be able to establish a duress defense to any or all of charges in the indictment since, to be entitled to an instruction, he would need to establish that, at the time of his criminal conduct:   (1) he faced a threat of force (2) "sufficient to induce a well-founded fear of impending death or serious bodily injury," and (3) he lacked a "reasonable opportunity to escape harm other than by engaging in the illegal activity." *United States v. Gonzalez,* 407 F.3d 118, 122 (2d Cir. 2005). A defendant is entitled to a jury instruction regarding duress only if he makes "some showing on each element" of the defense. *Id.; accord United States v. Bakhtiari,* 913 F.2d 1053, 1057–58 (2d Cir.1990).   In any event, this would be matters addressed at trial and not at a detention hearing.

referred Witness A's getting a $20 bag of crack from Carr).

On June 12, 2019, Carr and Witness A agreed to meet at "34," which was a reference to a restaurant located on Route 34 (Derby Avenue) owned by Carr.   Witness A advised that he was 15 minutes away.   Based on that call, law enforcement set up surveillance at Mama Rosa's II Restaurant and Pizza, located at 185 Derby Avenue, New Haven, CT.   The officers observed Witness A arrive in a vehicle and go into the restaurant.   After the vehicle left a short time later, it was stopped by marked NHPD vehicles.

Officers observed a small red tinted bag with a rock-like substance (field tested positive for cocaine) on the front seat.   Witness A then[2] claimed that he did not know where it came from and that someone must have placed it there without his knowledge when he went into the restaurant.   During a search of Witness A, however, he admitted that he had hid a "piece" and "bags" in his sock, and the officers recovered a glass pipe and four wax folds from his sock of a substance which field tested positive for heroin.

The third category of evidence relates to the July 10, 2019 search warrant which was executed at Carr's place of business located at 60 Connolly Parkway, Building 12, Unit 101, Hamden, Connecticut, the place from which the Confidential Source had purchased narcotics from Carr.   Officers recovered from that location two knotted bags with a white powdery substance (initial test results were inconclusive, but the substance has been sent to the DEA laboratory for further testing), three digital scales, a box of .380 ammunition, a blender with white powdery

---

[2] Witness A has since been interviewed and identified a photograph of Carr as a person from whom he bought $50 worth of heroin every other day, as well as crack on occasion.   An extraction of IMessages from Carr's telephone reflects communications from as early as June 13 and as recently as July 9, 2019 between the Witness and Carr arranging for meetings and reflecting, for example, Witness A seeking to trade a gold chain that he/she valued at $400 for "60" (interpreted by the agents as referring to a quantity of narcotics) and "call[ing] it even."

substance, and narcotics paraphernalia including baggies, rubber bands and Inositol (a typical agent used to cut cocaine).

Finally, Carr was intercepted pursuant to court order in communications occurring over a telephone utilized by co-defendant Carl Merritt, as well as two telephones utilized by Carr himself. The evidence revealed that Carr was supplying cocaine to, among others, Carl Merritt, who, in turn, was supplying the cocaine to Galberth (who died in a shootout with police early June 2019).

Although Carr refers in his motion for release on bond to a potential defense of renunciation, the evidence developed to date would not support that defense (assuming such a defense exists).   To be sure, intercepted communications reflected that, at least as of April 6, 2019, Carr was expressing concern about dealing drugs to Galberth.   Nevertheless, the Government has developed evidence that on March 15, 2019, prior to the initiation of court-authorized interceptions, there were 14 calls between a telephone utilized by Carr and Galberth's telephone.   Moreover, the Government has developed evidence that Carr had been directly selling narcotics to Galberth.

Moreover, during the course of the wiretap, there were numerous instances which provide circumstantial evidence that Carr was supplying Merritt with narcotics who, in turn, was providing them to Galberth.   For example, on March 20, 2019, Merritt called Carr at 12:34 p.m. and, thereafter, Galberth and Merritt made arrangements to meet.   On March 21, 2019, at about 4:13 p.m., Galberth told Merritt to meet him.   Merritt then called Carr at 4:33 p.m. prior to Merritt's meeting with Galberth at about 5:20 p.m.   On that same date, at 9:28 p.m. Merritt spoke to Galberth and then called Carr two minutes later.   On March 28, 2019, at 10:32 a.m., Galberth and Merritt made plans to meet "[i]n 45 minutes."   Merritt then called Carr at 10:34 a.m.   Galberth and Carr followed up about meeting at 12:51 p.m.   Merritt then told Galberth that he was at the

"restaurant" (believed to be Carr's restaurant), and Galberth advised Merritt that he was on the way.

Accordingly, the evidence against Carr is manifold and, in the Government's view, extremely strong.

Moreover, Carr's history and characteristics strongly counsel that there is no condition or combination of conditions which will ensure the defendant's appearance at court and the safety of the community.    A review of his criminal record makes this plain.

On July 15, 1983, Carr and two other individuals were involved in an attempted armed robbery at a motel and an armed robbery of a Kwik-Pic store in New Haven, involving the use of a sawed-off shotgun. On or about July 19, 1983, Carr was arrested on a weapon's charge and admitted his involvement in the July 15, 1983 attempted armed robbery and armed robbery. Carr was sentenced on October 21, 1983 to an effective sentence of eight years' imprisonment, suspended after four years served, and five years' probation, which was modified on August 2, 1985, to eight years' imprisonment, suspended after three and one-half years.

Carr was released from custody on October 12, 1985 and placed on probation. On December 8, 1985, Carr was arrested for possession of a weapon in a motor vehicle.    On November 9, 1986, he was arrested for possession of narcotics (the offense had occurred on May 26, 1986).    In January 1987, he was sentenced to an effective sentence of three years' imprisonment concurrent with four years' imprisonment on the probation violation.    On May 20, 1989, Carr absconded from a halfway house.

On February 1, 1990, Carr was arrested for criminal possession of a weapon, no pistol without a permit, and interfering, as well as assault in the third degree.    In that case, officers saw Carr on the street and knowing he had a warrant, attempted to stop him.    Carr ran from the police

and, when caught, struggled with the officers.    During the struggle, Carr reached for a firearm in his waistband; however, officers were able to place him into custody before he was able to remove the firearm.    The firearm was a semi-automatic pistol with 11 hollow-point rounds in the magazine and one in the chamber.    After his arrest Carr threatened the arresting officers that he was going to get back at them by doing harm to them.    He was held in custody that date and was subsequently sentenced to five years' imprisonment, suspended after three years.    He was also sentenced to a consecutive two-year suspended sentence, and five years of probation on the escape conviction.

Carr remained in custody from February 1, 1990 until he was released on state parole on July 13, 1992, and he was returned to custody with new charges on February 23, 1993, and released again to parole on February 15, 1995.

Some four months later, on June 12, 1995, Carr was arrested for threatening to shoot a victim the victim and arrested again on November 15, 1995 for threatening when he showed the victim a firearm.

On November 15, 1995, police responded to a report of a man with a firearm.    When the police arrived, they saw the defendant, who began to run away and discarded a loaded semi-automatic pistol.    Carr was arrested on state charges, which were adopted federally.    *United States v. Frank Carr*, Case No. 3:96CR69 (AVC).

On December 27, 1995, Carr was arrested for murder arising out of a double shooting of two brothers the previous day, one of them fatally.    Carr was identified as the shooter and was himself treated at the hospital for gunshot wounds arising out of the shootout with the brothers. On January 24, 1997, Carr was sentenced on his plea to Manslaughter in the First Degree to 20 years of imprisonment, suspended after 10 years, with five years' probation.    In the interim, on

December 23, 1996, Carr was sentenced by Judge Covello to 60 months imprisonment, followed by three years of supervised release, on the federal firearms charge.

Carr was released to parole on November 22, 2004 and returned to custody with a sale of narcotics charge arising out of his possession of 50 bags of heroin less than three months later on February 12, 2005.   He was convicted of that charge on June 30, 2005 and sentenced to three years of imprisonment.   Judge Covello also revoked his supervised release on July 1, 2005 and sentenced him to 24 months of imprisonment.   Carr was discharged from custody on August 24, 2011 and placed on probation.

On or about November 20, 2011, November 28, 2011, and December 22, 2011, a NHPD CW made controlled purchases of street distribution quantities of heroin from Carr.   On or about February 23, 2012, law enforcement received information that Carr and another individual would be returning by train from New York after being resupplied with heroin.   The next day, officers observed Carr and another man arrive by train and enter a car.   The agents then stopped Carr and another individual in a car, and recovered a backpack with 1,840 baggies of heroin with a net weight of 66.9 grams, along with four cellular telephones and $3,074 in U.S. currency.   Carr was arrested and charged federally on March 8, 2012. *See* No. 3:12CR53 (AWT).

On July 2, 2012, Carr pleaded guilty to a substitute information charging him with possession with intent to distribute and the distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) and was sentenced by Judge Thompson on January 2, 2013 to 63 months of imprisonment (the bottom of the applicable sentencing guideline range), followed by five years of supervised release.   On May 13, 2015, Carr's sentence was reduced to 51 months' imprisonment, pursuant to 18 U.S.C. § 3582(c)(2).

Carr began his term of federal supervised release on or about November 16, 2015.   On

June 28, 2017, Judge Thompson reduced Carr's period of supervised release by a year to expire on November 15, 2019 since (at least to the Court's knowledge), Carr had successfully completed the Support Court program.

That Carr was on supervised release at the time of the instant offense is a factor the Court is instructed to take into account in considering whether release is appropriate.   Indeed, it places the burden on Carr to establish by clear and convincing evidence that there are conditions of release which will ensure his appearance and the protection of the community, something he cannot do given the offense charged and his criminal record.

As to his proposal, Carr seeks to be placed on home confinement at 687 Pine Rock Avenue, Hamden, Connecticut, which he shares with Joyce Bellamy.   The Government notes that a federal search warrant executed at that location on July 10, 2019 recovered $2,480 in cash secreted from the ceiling.   The Government also notes that Ms. Bellamy, under the name of Joyce Winston, is herself a convicted felon, having been sentenced to 27 months on May 26, 1998 for conspiracy to possess with intent to distribute 50 or more grams of cocaine base. *United States v. Joyce Winston*, No. 3:96CR219 (AVC).[4]

---

[4]The Government understand that Ms. Bellamy also has a prior state felony conviction for Assault in the Second Degree in 1991 and a conviction for the Class A misdemeanor of Threatening.   In this connection, the Government notes its recovery pursuant to a federal search warrant of one of Carr's telephones of videos apparently sent via message which appears to depict Ms. Bellamy shooting firearms on or about March 3, 2018, at Greyson's Guns Shooting Club and Range, in Orange, Connecticut.   In the waiver she signed at the time she used the range, she answered in the negative as to whether she had ever been convicted of a Class A or B felony or Misdemeanor, and affirmed under penalty of perjury that she was not legally prohibited from possessing a firearm or ammunition by any provision of law of the United States. Also of interest is a conversation intercepted pursuant to court order between Ms. Bellamy and the defendant on May 8, 2019, following the seizure of over $70,000 of cash and a firearm (and magazines) from coconspirator Carl Merritt.   After first noting, "I mean what's the big deal, I mean it's just money and drugs," Ms. Bellamy acknowledges Carr's belief that the police were going to keep the money since "he [Merritt] don't have no proof of the money," Ms. Bellamy

Carr claims that, by "[w]orking with Court Support services," the safety of the community and his appearance in court will be ensured.   With all due respect, this argument requires, in the Government's view, a fair degree of chutzpah given (1) Carr's numerous violations of state probation sustained for committing crimes while on release on state charges; (2) his 2005 violation of federal supervised release; and, perhaps, most tellingly, (3) the fact that he was under federal supervision at the very time he was involved in narcotics trafficking in this very case; indeed, after convincing the Court and Probation Office that he merited a reduction in his term of supervised release by successfully completing the Support Court program.   It is clear that Carr is not amenable to supervision and that he will present a risk to the community if he is released on bond.

### III.   <u>CONCLUSION</u>

Given the serious nature of the offenses charged (including the fact that involve narcotics and at least two of which carry a mandatory minimum ten year and up to life sentence), the strength of the evidence against him, and Carr's history and characteristics – reflecting unremitting and extremely serious criminal conduct including manslaughter in the first degree, armed robbery with a sawed-off shotgun, possession of a firearm and ammunition and escape, convictions in both federal and state court for drug dealing, and violations of federal supervised release and state probation – the Government respectfully submits that there are no conditions or combination of conditions which will ensure the safety of the community and the appearance of the defendant in court.

---

muses, "[w]ell, you know the money, we can get the money back, ha, ha, ha, ha, cause you know, I'm clean, you know. . . . I've had some large withdrawals . . . .   Cause he, he actually say that ugh, you know he did some work for me or something like that."

Accordingly, the Government respectfully submits that Carr should remain detained pending trial.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/

ANTHONY E. KAPLAN
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT08083
Anthony.kaplan@usdoj.gov
157 CHURCH STREET; 23rd FLOOR
NEW HAVEN, CT 06510
203-821-3700

C E R T I F I C A T I O N

I hereby certify that on August 26, 2019 the foregoing Memorandum in Opposition to the Defendant's Motion for Release was filed electronically.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.   Parties may access this filing through the Court's system.

/s/
ANTHONY E. KAPLAN
ASSISTANT UNITED STATES ATTORNEY