UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No. 3:19CR180 (RNC) |
| v. | : | |
| | : | |
| FRANK CARR | : | May 6, 2020 |

## GOVERNMENT'S OMNIBUS MEMORANDUM IN RESPONSE TO PRE-TRIAL MOTIONS TO DISMISS, TO SUPPRESS EVIDENCE, TO HOLD A RELIABILITY HEARING AND TO OBTAIN STATEMENTS

The Government respectfully submits this memorandum of law in opposition to four motions filed by defendant Frank Carr on March 19, 2020. *See* Doc. Nos. 885-888. Each of the pending motions relate to a confidential, cooperating source identified as CS-3 in the Government's wiretap applications and discovery materials. Specifically, Carr makes the following motions, reflecting escalating requests for relief: (1) a motion seeking immediate production of all witness statements made by CS-3, as well as CS-3's criminal record, *see* Doc. No. 886; (2) a motion for what Carr calls a "pre-trial reliability hearing" to establish the reliability of the testimony to be offered by CS-3, *see* Doc. No. 885; (3) a motion to suppress all evidence obtained from CS-3 or as a result of his involvement in the case, on the basis of entrapment, *see* Doc. No. 888; and (4) a motion to dismiss all counts of the operative Second Superseding Indictment, also on the basis of entrapment by the Government and CS-3, *see* Doc. No. 887.

Each of these motions is without merit. With respect to the defendant's motion for immediate production of witness statements and criminal history, the Government has already produced all recordings of the controlled purchases made by CS-3 and the corresponding law

1

enforcement reports and will produce any additional material relating to CS-3 in time for the defendant to effectively use it at trial, consistent with all obligations under *United States v. Giglio*, 405 U.S. 150 (1972) and 18 U.S.C. § 3500.   With respect to the defendant's motion for a "pre-trial reliability hearing" for CS-3, the request has no basis in law, as the credibility of fact witness CS-3 is an issue squarely within the province of the jury.   Finally, with respect to the defendant's motions to suppress all evidence derived from CS-3 and to dismiss the operative indictment wholesale, the defendant's purported basis of entrapment is an affirmative defense to be raised at trial (if the defendant can make an adequate threshold showing, which is not the case here), and does not constitute valid grounds for either suppression or dismissal.   For these reasons, and those discussed at greater length below, all four motions should be denied.

## I.      Factual Background

The investigation that resulted in the pending charges against defendant Frank Carr was initiated in late 2018 and targeted a drug trafficking organization ("DTO") operating principally in New Haven, Connecticut, and extending north to Fitchburg, Massachusetts.   The DTO, led by Samuel Galberth and others, trafficked in crack cocaine, powder cocaine and heroin.   After an initial phase in which investigators analyzed information, identified key properties used by the DTO, performed surveillance, and coordinated with cooperating sources to effectuate a controlled purchase and a consensually monitored phone call, investigators began electronic surveillance of Galberth and his co-conspirators.[1]

---

[1]      Galberth's communications continued to be monitored pursuant to court order until mid-May 2019, when his long-time girlfriend and DTO confederate Tamika Jones was found strangled to death in Fitchburg, Massachusetts in a car used by Galberth.   At that time, Galberth ceased using telephone lines intercepted by investigators.   Galberth himself became the prime suspect in Jones's murder.   Galberth and an associate disappeared and remained on the run for approximately three weeks.   Investigators obtained state and federal arrest warrants as well as cell phone location warrants, which enabled them to

On March 15, 2019, the Court granted authorization for investigators to begin wiretap interceptions over two telephones associated with the DTO:   Galberth's personal telephone (TT-1) and a "work" phone that the DTO used for street-level narcotics distribution (TT-2).   Over the next three months, based substantially on calls intercepted over TT-1 and TT-2, investigators obtained court authorization to intercept communications over seven additional telephone lines: a telephone used by cocaine supplier Carl Merritt (TT-3), a successor DTO "work" phone used for street-level drug sales (TT-4), a telephone used by Galberth's top lieutenant Tommy Julius (TT-5), two separate telephones used by narcotics supplier Frank Carr (TT-6 and TT-7), and two telephones used by heroin traffickers Barry Atkinson and Brian Backman (TT-8 and TT-9, respectively).

Based substantially on the wire and electronic intercepts, investigators were able to develop information about sources of supply.   For example, the interception of calls primarily over TT-4 and TT-5 led to the identification of Anderson Atkinson and Brian Backman as sources of heroin. Specifically, during the period of interceptions, Julius used TT-4 to reach out to Atkinson in search of heroin for resale.   After gaining authorization to intercept wire communications over Atkinson's phone (TT-8) on May 14, 2019 and wire communications over Backman's phone (TT-9) on June 10, 2019, investigators intercepted calls revealing that Backman was in the process of arranging a large shipment of heroin from a source in New York City.   On June 16, 2019, Atkinson and co-defendant Dena Draughn were arrested after the latter returned from New York with over 10,000 baggies of heroin packaged for distribution.

---

track Galberth to a motel in Westchester, New York.   When law enforcement attempted to execute the warrants, Galberth engaged the officers in a shootout, which ended in Galberth's death and the wounding of two officers.

On the cocaine side, investigators quickly identified Carl Merritt as a supplier to the DTO based primarily on intercepts over TT-1.    Merritt's phone (TT-3) was then subject to interception from April 4, 2019 to April 13, 2019.    When the investigators intercepted communications suggesting that Merritt was planning to kill Galberth over a drug debt, Merritt was arrested on state charges on April 12, 2019 and remained in custody for the balance of the investigation.

Intercepted communications over Merritt's telephone led investigators to Frank Carr, whom the calls and other evidence identified as a source and seller of crack cocaine and heroin. Two of his telephones were subject to electronic surveillance: TT-6 was intercepted pursuant to court order from April 26, 2019 to May 11, 2019, and TT-7 was intercepted from May 14, 2019 to June 12, 2019.

Additionally, a confidential source, described in the wiretap affidavits and discovery materials as CS-3, reached out to investigators in late April 2019 with information regarding Carr's then-ongoing criminal activity.    Notably, CS-3 initiated the contact with law enforcement officers, rather than the reverse.    Subsequently, CS-3 made four separate controlled purchases of cocaine and crack cocaine/cocaine base directly from Carr, each of which formed a basis for one of the charges pending against Carr.    On May 1, 2019, law enforcement made a controlled purchase of 30.7 grams in net weight of powder and crack cocaine (27.151 grams of powder and 3.549 grams of crack cocaine) from Carr for approximately $1,500 through CS-3.    On May 6, 2019, law enforcement made a controlled purchase of 29.9 grams in net weight of powder cocaine from Carr for approximately $1,500 through CS-3.    On May 23, 2019, law enforcement made a controlled purchase of 78.2 grams in net weight of crack cocaine from Carr for approximately $3,300 through CS-3.    On June 6, 2019, law enforcement made a controlled purchase of 29.4

4

grams in net weight of crack cocaine from Carr for approximately $1,400 through CS-3.   Each of these controlled purchases was video- and audio-recorded.   Certain of the video- and audio-recorded controlled purchases took place at Carr's office space in Hamden, Connecticut, where evidence of drug trafficking was seized at the time of Carr's arrest, as further detailed below.

Moreover, the evidence of Carr's drug trafficking activity extended well beyond the four controlled purchases made by CS-3.   Carr's intercepted communications included extensive drug-related communications with multiple individuals, much of which pre-dated or was otherwise unconnected with CS-3.   For instance, Carr discussed, in coded language, his drug trafficking activity—including, but not limited to, provision of drugs to customers, proceeds of drug sales ("stacks"), drug debts owed to him, and the avoidance of law enforcement attention—in communications with co-defendant Carl Merritt that pre-dated CS-3's cooperation with investigators and was in any event wholly unconnected to CS-3.   *See, e.g.*, Sessions 126, 156, 171, 350, 352, 574, 577, and 778 over TT-3.   Carr also spoke about his drug trafficking activity with co-defendant and collaborator Jeffrey Brazier on multiple occasions.   On one occasion, for example, Carr advised Brazier, using coded language, that he had received a large shipment of cocaine—a conversation that had nothing to do with CS-3.   *See* Session 47 over TT-7.

Further, CS-3 is merely one of a number of witnesses who have provided information about Carr's involvement in narcotics trafficking.   Both before and after charges were filed against Carr, investigators met with witnesses to Carr's involvement in the drug trade.   The Government anticipates that there will be witness testimony at trial as to Carr's involvement in narcotics distribution to customers as well as his sale of significant quantities of narcotics to the Galberth DTO in or about March of 2019.   Much of this activity well pre-dates CS-3's association with

Carr.   Where possible, these witness statements have often been corroborated by other evidence.

Thus, Carr's sale of drugs to CS-3 in no way represented the only times he sold narcotics. Indeed, those controlled purchases did not even represent the only times investigators intercepted the physical narcotics packages that Carr had personally sold.   On June 12, 2019, investigators intercepted a call in which a drug customer sought to purchase narcotics from Carr, and Carr directed the customer to meet at his restaurant.   Under law enforcement surveillance, the customer briefly met Carr at the designated location and left, after which investigators conducted a "walled-off" stop of the customer's motor vehicle and recovered 0.152 grams in net weight of crack cocaine and 0.1 grams in net weight of fentanyl, which the customer had just purchased from Carr.

On July 9, 2019, a federal grand jury sitting in New Haven returned a fifteen-count Indictment charging Frank Carr and 24 co-defendants with violations of multiple federal narcotics and firearms laws.   The following day, Carr was arrested at his home, and search warrants were executed at Carr's home and his office, both in Hamden, Connecticut.   During the execution of the search warrants, law enforcement officers seized six cellular telephones, $2,480 in cash, .380 caliber ammunition, and apparent drug paraphernalia, including a scale, baggies bearing a red apple logo, empty wax folds, a stamp pad, gloves, mini rubber bands, and a bottle of Super Inositol, a substance that is commonly used as a cutting agent by narcotics dealers.

The operative Second Superseding Indictment, filed on February 27, 2019, charges Carr with the following six offenses: (a) in Count One, conspiracy to distribute and possess with intent to distribute cocaine base, cocaine and heroin in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(B) and 841(b)(1)(C), with particularized allegations that 500 grams or more of cocaine

and 28 grams or more of cocaine base/crack cocaine are attributable to Carr; (b) in Count Four, possession with intent to distribute and distribution of cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), arising out of the May 1, 2019 controlled purchase by CS-3; (c) in Count Five, possession with intent to distribute and distribution of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), arising out of the May 6, 2019 controlled purchase by CS-3; (d) in Count Six, possession with intent to distribute and distribution of 28 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), arising out of the May 23, 2019 controlled purchase by CS-3; (e) in Count Seven, possession with intent to distribute and distribution of 28 grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), arising out of the June 6, 2019 controlled purchase by CS-3; and (f) in Count Eight, possession with intent to distribute and distribution of cocaine base and heroin[2] in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), arising out of the June 12, 2019 "walled-off" stop of the drug customer who had just purchased narcotics from Carr.

On March 13, 2020, the Court held a hearing at the Government's request, pursuant to *Missouri v. Frye*, 566 U.S. 124 (2012), to canvas the defendant and his counsel on Carr's rejection of the Government's offer of a plea agreement.    Although trial was initially set for May 12, 2020, it has now been continued *sine die* by the Court's General Orders prompted by the current coronavirus pandemic.    At this time, all trials in this District are currently postponed until after June 15, 2020, and the Court has not yet set a new trial date.

---

[2]    Investigators initially believed that Carr had sold this customer cocaine base and heroin, because the substances field-tested positive for those two narcotics, respectively.   More recently, after the grand jury returned the Second Superseding Indictment, lab reports indicated that the substance thought to be heroin was actually fentanyl.

**II.      Motion for Production of CS-3 Statements and Record**

The defendant's first motion seeks the immediate production of all investigator and

prosecutor notes taken during witness interviews of CS-3 and of CS-3's criminal record.   *See*

Doc. No. 886.   For the reasons set forth herein, this motion should be denied.

**A.  Government's Discovery Productions**

The Government made its initial discovery disclosure to defendant Frank Carr on July 24,

2019.   The accompanying discovery letter provided information as to the various categories of

material required to be disclosed pursuant to Federal Rule of Criminal Procedure 16 and this

District's Standing Order. Since then, the Government has sent additional letters and emails

enclosing supplemental discovery materials.

To date, the Government has produced over 20 discs of discovery materials comprising

many thousands of pages of discovery, in compliance with its discovery obligations.    Among the

voluminous discovery produced to date, Carr has received all of the video- and audio-recordings

of the four controlled purchases made by CS-3, as well as the FBI reports (Form 302s)

documenting those controlled purchases.   He has also received all recordings from the wiretap,

corresponding line sheets, and voluminous investigative and surveillance reports, lab reports,

subpoena returns, and the other categories of materials required to be produced by the Court's

standing order on discovery.

Also, by email of February 6, 2020, the Government produced to Carr's defense counsel

additional information relating to the FBI's involvement with CS-3, including that the FBI paid

CS-3 in connection with his/her assistance with the controlled purchases from Carr.    This

disclosure included information about the FBI's identification of certain limited discrepancies in

CS-3's involvement in the controlled purchases, which were, in any event, video- and audio-recorded.   The Government also advised Carr's counsel that the FBI assisted CS-3 in relocating out of state for his/her safety.

Moreover, the Government arranged on February 19, 2020 to meet in person with Carr and his defense counsel, at which time investigators described in detail the evidence against Carr with respect to the narcotics conspiracy (Count One), the four controlled purchases made by CS-3 (Counts Four, Five, Six and Seven), and the "walled-off" stop following his sale of drugs to a consumer (Count Eight).   During that meeting, FBI investigators also played recordings and showed at least one video to Carr to provide non-exhaustive examples of the evidence against him. The Government has also disclosed to Carr and his counsel evidence that Carr provided a large quantity of narcotics to the Galberth DTO prior to the inception of the wiretap and prior to the Government's (or Carr's, to the Government's knowledge) involvement with CS-3.   During the February 19 meeting, investigators contextualized discrepancies with CS-3's involvement in the controlled purchases and explained that the body of evidence against Carr extended well beyond that provided by CS-3.

The Government has not, to date, received any disclosures from Carr.   The Standing Order on Discovery requires that, within 14 days after the Government's provision of initial discovery, defense counsel must inform the Government of the nature of its defense.    Though the pending motions seem to suggest that Carr intends to make an entrapment defense, the Government has not yet received any notice of that defense.

### B. Applicable Law

The Government's general discovery obligations are set forth in Federal Rule of Criminal Procedure 16.   This Rule lists multiple categories of information subject to disclosure, including oral, written or recorded statements of the defendant, the defendant's prior criminal record, documents and objects that the Government intend to use in its case-in-chief, which are material to the preparation of the defense or which belong to the defendant, certain material reports of examinations, and disclosure of expert witnesses.   Rule 16 explicitly identifies as information *not* subject to disclosure "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."   It further specifies that "the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500" is *not* authorized.

This District's Standing Order on Discovery generally tracks the requirements in Rule 16, but adds additional detail and obligations—in particular, the obligation to furnish initial discovery within 14 days of the defendant's arraignment.   The Standing Order on Discovery also expressly notes the independent obligations of the Government to produce information favorable to the defendant on the issues of guilt or punishment falling within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, and information concerning the existence and substance of any payments, promises of immunity, leniency, or preferential treatment, made to prospective government witnesses, within the scope of *United States v. Giglio*, 405 U.S. 150 (1972), *Napue v. Illinois*, 360 U.S. 264 (1959) and their progeny.   Like Rule 16, the Standing Order identifies reports, memoranda or other internal government documents made by Government counsel or a Government agent as information "not subject to disclosure" and further orders that statements

10

made by prospective Government witnesses are not discoverable except as provided in 18 U.S.C. § 3500 (commonly known as the Jencks Act).

With respect to statements made by prospective Government witnesses, 18 U.S.C. § 3500(a) provides that "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery or inspection *until said witness has testified on direct examination in the trial of the case*" (emphasis added). A statement within the meaning of the Jencks Act is defined as "a written statement made by said witness and signed or otherwise adopted or approved by him"; a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously"; or a statement made by a witness to the grand jury. 18 U.S.C. § 3500(e).

In *Palermo v. United States*, the Supreme Court held that because the Jencks Act is meant to restrict the defendant's use of discoverable statements to impeachment, 360 U.S. 343, 349 (1959), "only those statements which could properly be called the witness' own words should be made available to the defense." *Id.* at 352. The Court went on to elaborate that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." *Id.* at 352-53. Consistent with *Palermo*, the Second Circuit has held that FBI reports are *not* discoverable under the Jencks Act because they are not statements of the witness within the meaning of the statute. *See United States v. Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995).

## C.  Discussion

The defendant's motion for the production of all notes taken relating to CS-3, as well as

his/her criminal record, is simultaneously needless, premature and unsupported by fact or law.

The motion is needless because, as detailed above, the Government has already produced CS-3's own recorded activity in the form of the video- and audio-recordings of the controlled purchases made from Carr.   Although, as discussed above, FBI reports do *not* constitute discoverable witness statements pursuant to the Jencks Act, the Government has nonetheless produced the reports of the controlled purchases and additional reports regarding the FBI's identification of a discrepancy in CS-3's involvement in the purchases, as well as the FBI's payment of CS-3 and assistance in relocation.   Further, as detailed above, the Government met with Carr in the February 19 'reverse proffer' session to provide a limited overview of its evidence, including shortcomings involving the limited discrepancies in CS-3's narrative and the fact that CS-3 was paid and relocated by law enforcement.   During plea negotiations and otherwise, the Government has discussed that evidence (including regarding CS-3) with Carr's counsel repeatedly.   Insofar as Carr relies on *Brady v. Maryland*, 373 U.S. 83 (1963) or *United States v. Giglio*, 405 U.S. 150 (1972) to demand additional immediate disclosures, the Government notes that it has complied with its *Brady* and related *Giglio* obligations (and will be producing in advance of trial additional information to the defense relating to CS-3, including his/her criminal record), making the instant motion unnecessary.

The motion is also premature insofar as it demands Jencks Act material well before the time required by the statute.   The Jencks Act itself requires disclosure of witness statements only *after* the witness has testified on direct examination in the trial of the case.   18 U.S.C. § 3500(a).   Insofar as there is any remaining discoverable Jencks Act material relating to CS-3 that has not yet been produced, the defendant does not have any right to the production of that

12

material months in advance of any trial—particularly where, as here, no trial date has even been set.

Indeed, the Government has serious concerns about the safety of CS-3 if his/her identity were to be exposed prematurely—concerns that have led the FBI to assist CS-3 in relocating out of state.   To the extent that Carr's request for CS-3's criminal record may function as a request for information or confirmation of his/her identity, that information must be treated with care and according to law.

The Government has already advised in its July 24, 2019 initial discovery letter that it will provide *Giglio* disclosures and Jencks Act material approximately 10 days in advance of trial, once the Government identifies who will testify at trial, to enable the defense to prepare. In other words, the Government has already indicated the intention to go beyond its obligations by providing such material in advance of trial, rather than after the direct examination of the witness in question.   No additional disclosures are required now.

Finally, the motion is unsupported by fact or law.   The defendant relies on *Goldberg v. United States*, 425 U.S. 94 (1976) and a series of out-of-Circuit cases to argue that he should be entitled to the prosecutors' notes from meetings with CS-3.   As an initial matter, that reliance is misplaced as a matter of law.   *Goldberg* merely held that "a writing prepared by a Government lawyer relating to the subject matter of the testimony of a Government witness" is producible under the Jencks Act *if* that writing has been "signed or otherwise adopted or approved by the Government witness."   *Id.* at 98.   Here, the Government has not yet definitively determined whether CS-3 will be called as a Government witness, and as discussed above, the Jencks Act does not require the production of any of CS-3's statements until after his/her direct examination.

For this reason, any FBI reports from meetings with CS-3 are not producible at this time.   Nor indeed, would such FBI reports be subject to production at a later date, because under the rubric laid out by the Jencks Act and noted in *Goldberg*, CS-3 never signed or approved the FBI's notes or reports.[3]   *See Scotti*, 47 F.3d at 1249.

By the instant motion, Carr seeks not merely the FBI reports, but also the "prosecutor's notes taken during a witness interview" of CS-3.   As a factual matter, the prosecutors in this case have not, to date, met with CS-3.   Accordingly, Government counsel have no notes to produce from meetings that never took place.

In sum, the Government has amply fulfilled—and indeed, exceeded—its discovery obligations to produce the evidence it has adduced via the cooperation of CS-3 and to provide all potential *Brady* disclosures.   Insofar as the Government has continuing obligations, including Jencks and *Giglio* disclosures, they will be produced at the appropriate time in advance of trial. There is no legal or factual basis for the defendant's motion for further disclosures at this time, and indeed premature disclosure of CS-3's identity could seriously endanger her/him. Accordingly, the defendant's motion should be denied.

### III.   Motion for Pre-Trial Judicial Reliability Determination and Hearing

The defendant's second motion seeks a pre-trial judicial determination as to the reliability of CS-3, to follow a hearing at which the Government would be required to establish CS-3's reliability to the Court's satisfaction.   *See* Doc. No. 885.   For the reasons set forth herein, this motion should be denied.

---

[3] Nonetheless, as discussed above, the FBI reports of the controlled purchases undertaken by CS-3 *have* already been produced, in excess of the Government's discovery obligations.

14

### A. Applicable Law

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and if "the fact is of consequence in determining the action."  Fed. R. Evid. 401.  "Evidence need not be conclusive in order to be relevant."  *United States v. Montsalvatge*, 850 F.3d 483, 494 (2d Cir. 2017) (citation omitted).  "Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility."  *United States v. Schultz*, 333 F.3d 393, 416 (2d Cir. 2003).

"It is a well-recognized principle of our trial system that 'determining the weight and credibility of a witness's testimony belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'"  *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (citation omitted).  *See also United States v. Noze*, 255 F. Supp. 3d 352, 353 (D. Conn. 2017), aff'd sub nom. *United States v. Dugue*, 763 F. App'x 93 (2d Cir. 2019) (precluding defense's proposed expert testimony denigrating the general credibility of cooperating witnesses on the basis that credibility determinations must be left to the jury alone).

### B. Discussion

The defendant's motion for a pre-trial hearing to evaluate the reliability of CS-3 is wholly without basis in law.  In the instant motion, Carr seeks a pre-trial hearing "whereby the Government would be required to establish to the satisfaction of the court the reliability of the confidential compensated informant witness and or [sic] his statements made by the informant to

be used at trial."   Def. Mot for Hearing at 1.   In the alternative, Carr asks that the Court "make a determination based upon the submission of the parties" as to CS-3's reliability as a witness.   *Id.*

This request runs squarely afoul of the axiomatic principle that determinations of the credibility of witnesses are entrusted to the jury, not the Court.   *See Nimely*, 414 F.3d at 397. Even in those limited circumstances where a judge is expressly charged to evaluate the credibility of witnesses—for example, in post-trial motions for a new trial under Federal Rule of Criminal Procedure 33—"it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment," such as where a witness' testimony is "patently incredible or defies physical realities."   *United States v. Ferguson*, 246 F.3d 129, 133- 34 (2d Cir. 2001).   There is simply no basis here to remove the credibility assessment function from the rightful province of the jury.   Indeed, unsurprisingly, Carr cites to no rule, statute or case that would require such an outcome.

Carr's only brief attempt to ground his request in law comes in his proposition that "[t]he federal system requires expert witnesses, who are also compensated, to be screened by the courts." Def. Mot. for Hearing at 1.   While true, it is unclear what connection that principle has to his request here.   CS-3 is, of course, a fact witness, not an expert witness whose expertise may be subject to challenge pursuant to *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).

The defendant also notes that federal courts "have authority to conduct reliability hearings" pursuant to their "general pre-trial authority to screen relevant and prejudicial evidence under Federal Rule of Evidence 104."   Def. Mot. for Hearing at 1.   This too is true.   But Carr does not actually cite any facts as to why CS-3's testimony would be irrelevant or unduly prejudicial.   He

16

merely states in conclusory fashion that CS-3 may constitute a "potentially unreliable, compensated criminal witness."   *Id.*   Separately, he notes that "undercover informants" sometimes believe they will "receive any form of leniency for their own crimes, avoid the institution of new criminal charges, aforementioned benefits for a spouse, intimate partner, or family member in exchange for their testimony."   There is no suggestion, however, that CS-3 received this type of benefit him- or herself, and to the extent he/she did receive a benefit, that information has been (or will be) disclosed in due course.

To this end, the Government has already disclosed that CS-3 was compensated for her/his cooperation in the controlled purchases.   Carr does not—and indeed cannot—explain, however, how the routine fact of a confidential source's compensation should bar that source from testifying. Insofar as CS-3 testifies at trial, Carr is free to cross-examine her/him on the facts of that compensation or to otherwise question CS-3, consistent with law, in such a way as to raise questions as to her/his credibility.   Indeed, defendants customarily challenge a cooperating source's incentives on cross-examination at trial.   *See, e.g.*, *United States v. Simels*, 654 F.3d 161 (2d Cir. 2011) (noting that defense counsel argued at trial that a cooperator's testimony was less credible because of the payments and other benefits he received from the Government). Ultimately, though, "[i]t is for the *jury* to decide if witnesses are lying."   *Noze*, 255 F.Supp.3d at 354 (emphasis added).

Insofar as this motion, like the motion for the production of CS-3's record and statements, functions as an attempt to prematurely reveal the identity of CS-3, it is inappropriate. As noted above, the Government has concerns about the safety of CS-3 as is—concerns that would only increase if her/his identity were to be provided prematurely to Carr.   Any attempt to

conduct an end-run around the applicable procedures for identifying, questioning, and testing the credibility of a confidential source should not be countenanced.

In sum, the law requires that the task of determining the credibility of CS-3 falls squarely within the province of the jury, not the Court.   Carr's motion for a judicial determination as to CS-3's "reliability" should be denied.

## IV. Motions to Suppress Evidence Related to CS-3 and to Dismiss the Indictment on Entrapment Grounds

The defendant's third motion seeks the suppression of all evidence obtained as a result of CS-3's involvement in the case, on the purported grounds of entrapment.   *See* Doc. No. 888. His fourth motion seeks to dismiss all counts of the operative Second Superseding Indictment, also on the purported grounds of entrapment.   *See* Doc. No. 887.   Because both motions seek relief on the grounds of alleged entrapment, and because they contain nearly identical content, this response discusses both jointly.

### A.  Applicable Law

"Entrapment is an affirmative defense that requires a defendant to prove by a preponderance of the evidence the government's inducement to commit the crime."   *United States v. Taylor*, 475 F.3d 65, 69 (2d Cir. 2007).   A valid entrapment defense consists of two related elements—*first*, "government inducement of the crime," and *second*, "a lack of predisposition on the part of the defendant to engage in criminal conduct." *United States v. Cromitie*, 727 F.3d 194, 204 (2d Cir. 2013) (quoting *Mathews v. United States*, 485 U.S. 58, 63 (1988)).   The defendant bears the prima facie burden of showing government inducement.   *See United States v Bala*, 236 F.3d 87, 94 (2d Cir. 2000).   Once that showing is made, the prosecution must then bear the burden of proving predisposition beyond a reasonable doubt.   *See United States v Al-Moayad*, 545 F.3d

139, 153 (2d Cir. 2008).   The defendant's burden of proof to show government inducement "should not be treated as a hollow requirement." *United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006).   Notably, given the defendant's arguments in the instant motions, the Second Circuit has cautioned that "[t]o satisfy the burden on inducement, a defendant *cannot* simply point to the government's use of an undercover agent or confidential informant."   *Id.* (emphasis added).

A defendant is entitled to a jury instruction on entrapment only where "there is sufficient evidence from which a reasonable jury could find entrapment."   *Matthews v. United States*, 485 U.S. 58, 62 (1988).   In those cases in which "the defendant's evidence is insufficient as a matter of law to establish the defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury."   *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997).   Even where the defendant *can* make the requisite initial showing of government inducement, if the evidence of predisposition is uncontradicted, the Court need not present the entrapment defense to the jury.   *See United States v. Miley*, 513 F.2d 1191, 1202 (2d Cir. 1975). *See also United States v. Gonzalez-Perez*, 778 F.3d 3, 11 (1st Cir. 2015) ("In order to be entitled to an instruction on entrapment, the record must show some hard evidence of both government inducement and the defendant's lack of predisposition.   This evidence must be more than uncorroborated self-serving assertions.") (citations omitted).

"Predisposition, the principle element in the defense of entrapment, focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime."   *Cromitie*, 727 F.3d at 204 (quoting *Mathews*, 485 U.S. at 63).   "[T]he fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution."   *Jacobson v.*

*United States,* 503 U.S. 540, 548 (1992) (internal quotation marks omitted).   Any of three potential methods of establishing a defendant's predisposition, first set forth by Judge Learned Hand, are available to the Government: (1) "an existing course of similar criminal conduct;" (2) "the accused's already formed design to commit the crime or similar crimes;" or (3) "his willingness to do so, as evinced by ready compliance."   *United States v. Sherman,* 200 F.2d 880, 882 (2d Cir. 1952) (quoting *United States v. Becker,* 62 F.2d 1007, 1008 (2d Cir. 1933).   The Second Circuit observed much more recently that "these three circumstances have remained in this Circuit the three ways available to the Government to prove a defendant's predisposition." *Cromitie,* 727 F.3d at 205.

As an affirmative defense, entrapment does not constitute valid grounds for the dismissal of an indictment or to bar prosecutions wholesale.   *See United States v. Russell*, 411 U.S. 423, 435 (1973).   Only in certain "extreme" cases may the due process clause require suppression of evidence or dismissal of criminal charges—and then, only where the government has engaged in particularly egregious conduct, such as "[e]xtreme physical coercion" or "torture."   *United States v. Chin,* 934 F.2d 393, 398-99 (2d Cir. 1991).   A due process claim does *not* depend on the degree of government inducement of the crime, but only may succeed where the "governmental conduct, standing alone, is so offensive that it shocks the conscience."   *United States v. Chin,* 934 F.2d 393, 397 (2d Cir.1991).   *See also United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999). Even in circumstances where Government agents have "planned the entire operation" of the crime, "invented all of the details of the scheme," and supplied the necessary instruments, the Second Circuit has found that the Government conduct complied with appropriate due process boundaries: "as with all sting operations, government creation of the opportunity to commit an offense, even

20

to the point of supplying defendants with materials essential to commit crimes, does not exceed

due process limits." *Cromitie*, 727 U.S. F.3d at 219.   "Such a claim rarely succeeds." *United States v. La Porta*, 46 F.3d 152, 160 (2d Cir.1994).

### B.  Discussion

The defendant's motions to suppress evidence and to dismiss the indictment must be denied for the simple reason that the basis of his motions is that he was entrapped, which is not valid grounds for either suppression or dismissal.   As the case law cited above amply explains, entrapment is an affirmative defense to be proven at trial, in those cases (unlike this one) in which the defendant can show both Government inducement of the crime *and* lack of predisposition on the part of the defendant.   Though the Government is confident that Carr cannot establish any part of an entrapment defense, insofar as he wishes to proceed with such a defense, that is a matter to be taken up at trial, not on pre-trial motions.[4]   His instant motions to suppress and to dismiss the indictment are meritless.

As to the pending motions, the analysis can conclude there.   They must be dismissed. This brief attempts, however, to address some of the legal and factual deficiencies in the defendant's motions to dismiss and suppress and in his claims of entrapment, to provide further context for the Court.

As the case law makes quite plain, any defendant seeking to advance an entrapment defense must adduce—at trial—sufficient evidence from which a jury could conclude that entrapment did indeed occur.   *See Matthews v. United States*, 485 U.S. 58, 62 (1988).   This

---

[4]      The Government also notes that it has received no formal notice of Carr's intention to proceed with an entrapment defense.

standard places the burden squarely on the defendant to prove by a preponderance of the evidence the government's inducement to commit the crime.   *See United States v. Taylor*, 475 F.3d 65, 69 (2d Cir. 2007); *United States v Bala*, 236 F.3d 87, 94 (2d Cir. 2000).   Defendant's burden, which is *not* "a hollow requirement," *United States v. Brand*, 467 F.3d 179, 190 (2d Cir. 2006), must be proven by competent evidence.   In the pending motions, however, Carr merely proceeds via attorney proffer to offer a series of unsubstantiated, unsworn allegations.   This is insufficient to carry his burden as a procedural matter.

Legally, the content of the allegations that Carr makes regarding CS-3's inducement is also plainly insufficient to meet his burden.   The motions allege that Carr "only became involved in any criminal activity upon the request of CS-3," that the "Government used CS-3 to play upon Mr. Carr's sensitivities regarding his involvement with his religion," and that "CS-3 was the actual perpetrator of this crime."   Def. Mot. to Suppress at 3-4; Def. Mot. to Dismiss at 3-4.   Nonetheless, the use of a confidential informant, including to make controlled purchases supervised by investigators, is routine and unremarkable.   Indeed, the Second Circuit has instructed that "[t]o satisfy the burden on inducement, a defendant *cannot* simply point to the government's use of an undercover agent or confidential informant."   *Id.* (emphasis added). But this is effectively all that Carr's motions claim.

Factually, Carr's allegations regarding CS-3's inducement are wholly unconnected to and indeed contradicted by the evidence.   Broadly speaking, Carr's conclusory, unsworn allegations that "CS-3 initiated the contact, put the criminal intent in the mind of the Defendant, and when he tried to resist, threatened and intimidated the defendant" and that "CS-3 is the actual perpetrator of this crime" are directly contrary to the evidence.   Def. Mot. to Suppress at 3, 5;

22

Def. Mot to Dismiss at 3, 5.   In fact, the indictment has charged, the provided discovery has shown, and the evidence at trial will substantiate that Carr's involvement in the charged drug trafficking pre- and post-dated his involvement with CS-3.   In general, the evidence demonstrates that Carr's criminal activity included his conspiracy with, illicit purchases from, and sales to, many others who had nothing to do with CS-3.   But even on a micro level, Carr's particular allegations are frequently simply wrong.   Without confirming or denying Carr's presumptions as to CS-3's identity (and potentially placing her/him at risk), the Government can nonetheless say that what Carr alleges—including, but certainly not limited to, the notion that the information provided by CS-3 to the Government "all predates any wiretapps [sic] or pen registers," that the Government somehow "sponsor[ed] CS-3 at the Church," that the Government "permit[ed] CS-3 to sell drugs and buy drugs on his own," and that the Government became an active participant in tax evasion by CS-3 by "allow[ing] [CS-3] to keep money from illicit drug activity, and not pay taxes on those funds"—is utterly baseless.   Def. Mot. to Suppress at 3; Def. Mot to Dismiss at 3.

The evidence also establishes that Carr's self-serving characterization of his interaction with CS-3 is similarly baseless.   Here, the Government need not rely only on CS-3's testimony alone.   All four controlled purchases conducted by CS-3 were both video- and audio-recorded. The recordings speak for themselves.   Contrary to Carr's allegations here, they reflect no "threat[s[" or "intimidat[ion]."   Def. Mot. to Suppress at 5; Def. Mot to Dismiss at 5.   They show, instead, Carr's active, willing participation in the sale of drugs on four separate occasions to someone he knew as an associate in the drug trade.   Similarly, the intercepted communications, some of which actually occurred while a controlled purchase was taking place,

23

reflect Carr's active, willing participation in the crimes.

In fact, Carr cannot prove, by a preponderance of the evidence, government inducement of his crimes and thus cannot meet his prima facie burden.   *See United States v Bala*, 236 F.3d 87, 94 (2d Cir. 2000).   But even if—contrary to the situation here—he could establish some evidence of inducement, it is unquestionable that he could not show the requisite second prong of an entrapment defense: lack of predisposition.   This Carr actually appears to concede, on the basis of his criminal history.   In fact, in both his motions to suppress and to dismiss, the defendant agrees that "Mr. Carr had a predisposition for committing drug offenses in the past." Def. Mot. to Suppress at 4; Def. Mot to Dismiss at 4.

Apart from Carr's own concession, the Government can (and will at trial) establish Carr's predisposition through multiple other means.   As the Second Circuit has instructed, the Government may show a defendant's predisposition via (1) "an existing course of similar criminal conduct;" (2) "the accused's already formed design to commit the crime or similar crimes;" or (3) "his willingness to do so, as evinced by ready compliance."   *Cromitie*, 727 F.3d at 205 (quoting *Sherman*, 200 F.2d at 882).   All three methods of establishing predisposition are present here.

The first method by which the Government can establish predisposition—showing a defendant's "existing course of similar criminal conduct"—is evinced here in a number of ways. First, the defendant's long history of drug crimes—including, most recently, his federal 2012 conviction for possession with intent to distribute and the distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C)—speaks to this "existing course of similar criminal conduct."   More recently, Carr's "existing course of similar criminal conduct" includes conduct

24

actually charged in the operative indictment, including his participation in the conspiracy charged in Count One, which pre-dates and is unrelated to the controlled purchases with CS-3. As discussed above, and as presented to Carr and his counsel, the Government has evidence that Carr sold a significant quantity of narcotics to the Galberth DTO in or about March 2019.   This transaction had nothing to do with CS-3 and, to the Government's knowledge, predated Carr's criminal involvement with CS-3.   Carr's conduct in the charged conspiracy is also consistent with the second method by which the Government can establish predisposition: showing his "already formed design to commit the crime or similar crimes."   *Cromitie*, 727 F.3d at 205).   In fact, Carr's participation in the Count One conspiracy shows more than an already formed design to commit crimes; it actually demonstrates his ongoing participation in the commission of the crimes that he himself designed.

Another of the charged offenses constitutes all three methods of showing predisposition. In Count Eight, Carr is charged with the sale on June 12, 2019 of crack cocaine and heroin to a customer (who was *not* CS-3), which was then recovered by investigators in the "walled-off" stop immediately after Carr made the sale.   This conduct demonstrates "an existing course of similar criminal conduct," an "already formed design to commit the crime or similar crimes" and an indication of Carr's "willingness to do so, as evinced by ready compliance."   *Cromitie*, 727 F.3d at 205.

Finally, the ample evidence of Carr's participation in the controlled purchases to CS-3, charged in Counts Four, Five, Six and Seven, demonstrates Carr's predisposition by showing "his willingness to [commit the crime], as evinced by ready compliance."   *Cromitie*, 727 F.3d at 205.   Though Carr tries to rewrite his own history with CS-3 as one that included threats and

25

intimidation, the hard evidence (including wiretap intercepts and video- and audio-recordings of the controlled purchases) demonstrate otherwise.   In fact, the conduct underlying all six counts applicable to Carr are mutually corroborative and speak with one voice.   They inescapably establish Carr's predisposition.

Carr's motion to dismiss Counts One and Eight—neither of which have anything to do with CS-3—provide yet another reason for viewing Carr's requests with skepticism.   Carr asks that the Second Superseding Indictment be dismissed "in its entirety."   Def. Mot. to Dismiss at 5.   But he does not, and cannot, explain why entrapment by CS-3 into the controlled purchases underlying Counts Four through Seven (even if it could be established) should have any effect on the two counts that do not involve CS-3 at all.   As to the conspiracy charged in Count One,[5] his purported grounds for dismissal or suppression of evidence apparently amount to a bare denial that he committed the crime of conspiracy.   His motions argue that, while the "Government claims [Carr's] communications illustrate possible drug dealing," Carr himself "has claimed from the beginning, that his communications . . . had to do with his legal businesses and not any drug dealing."   Def. Mot. to Suppress at 5; Def. Mot. to Dismiss at 5.   This is clearly an issue of fact to be decided by a jury at trial.   The Court simply cannot opine, without evidence, on whether Carr's version of events, or the Government's, is correct.

With respect to Carr's motion to suppress, Carr does not specify what evidence he is seeking to suppress.   Would his motion reach evidence related to Counts One and Eight, which do not involve CS-3?   Wiretap communications with persons other than CS-3?[6]   Seizures made

---

[5]      Carr is completely silent as to the conduct underlying Count Eight, and does not even attempt to explain why this count charging his sale of drugs to another customer should be subject to dismissal.

[6]      With respect to the wire, Carr briefly and without any explanation states that "On or about April

from Carr's home and office on the day of his arrest?   Testimony from CS-3 him- or herself?

Testimony from witnesses other than CS-3?   The video- and audio-recordings of the controlled

purchases?   And if so, on what grounds?   Carr's motion does not say.   He merely asks in

generalized and unexplained terms that "all evidence [be] suppressed as the 'fruit of the

poisonous tree.'"   Def. Mot. to Suppress at 6.   This is plainly insufficient and highlights the

lack of any legal support for the motions.

Carr's motions to suppress and dismiss are based on the legally inapposite and factually

deficient claim of entrapment.   He cannot receive relief on that basis.   Further, though he does

not fully articulate this claim, it is worth noting that Carr is also not entitled to any relief on due

process grounds.   Insofar as his unsworn, unfounded allegation that CS-3 "threatened" him

(Def. Mot. to Suppress at 5; Def. Mot to Dismiss at 5) could be construed as a due process claim

for suppression or dismissal, such a claim must fail.   Due process claims "cannot depend on the

degree to which the governmental action was responsible for inducing the defendant to break the

law" but rather "turn on whether the governmental conduct, standing alone, is so offensive that it

"shocks the conscience." *Chin*, 934 F.2d at 398.   These types of claims are reserved for

egregious governmental conduct such as "[e]xtreme physical coercion" or "torture." *Id.*   No

---

30th, May 1st, and May 6th of 2019, the Government allowed and permitted CS-3 to call the Defendant's phone for illegal purposes. The Government did not have an authorized wiretap until May 13, 2019. Said action is a violation of the Defendant's Fourth Amendment rights and should be suppressed." Def. Mot. to Suppress at 3.   It is unclear to the Government what Carr is arguing.   However, the Government notes that the stated facts are inaccurate:   the Government was intercepting one of Carr's phones (TT-6) pursuant to court order beginning on or about April 26, 2019 and obtained court authorization to intercept a second (TT-7) on or about May 14, 2019.   As to the remaining contentions, CS-3 did make certain calls to Carr in connection with the controlled purchases.   Insofar as CS-3 may have also made other calls to Carr unbeknownst to law enforcement, it remains unclear (and unexplained) why this sequence of events could be construed as a Fourth Amendment violation or grounds for suppression or, for that matter, even what evidence Carr is seeking to exclude on this basis.

such conduct by either the government or by CS-3—even according to Carr's own unfounded allegations—exists here.

In sum, entrapment is an affirmative defense that must be established by competent evidence at trial.   If an entrapment defense is pursued here, it would be (and indeed, at trial, will be) rebutted with ample evidence of predisposition.   Even if proven—which, for the reasons set forth above, among others, Carr cannot do—entrapment does not serve as a valid basis for suppression or dismissal.   The pending motions to suppress and dismiss are legally and factually unfounded.

## V.      Conclusion

For the reasons set forth above, the motions for immediate production of CS-3's statements and record, for a pre-trial reliability hearing, for suppression of evidence, and for dismissal of the indictment should be denied.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/

ELENA L. CORONADO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv09758
Elena.coronado@usdoj.gov
1000 Lafayette Blvd, 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000

ANTHONY E. KAPLAN
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct08083
Anthony.kaplan@usdoj.gov

PETER D. MARKLE
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct05098
Peter.markle@usdoj.gov
157 Church Street
New Haven, CT 06510
(203) 821-3700

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2020, a copy of the foregoing Government's Response to Motions to Suppress was filed electronically, and served by mail on anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system, or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.   Parties may access this filing through the court's CM/ECF system.

  /s/ *Elena L. Coronado*
ELENA L. CORONADO
ASSISTANT UNITED STATES ATTORNEY