UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:19CR180(RNC) |
| v. | : | |
| FRANK CARR | : | MAY 7TH, 2020 |

## MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR AN EMERGENCY ORDER FOR TEMPORARY RELEASE FROM CUSTODY

The Defendant, Frank Carr, through counsel, moves pursuant to Federal Rule of Criminal Procedure 46 and 18 USC Section 3142 this Court for emergency release from custody pending trial in the above-mentioned matter, on condition of home confinement with electronic monitoring and any other further requirement(s) the Court deems necessary. He has someone to sponsor home confinement. This is a renewed motion authorized and invited by the Court if conditions have changed. See, Ex. A.

Mr. Carr is a pretrial detainee currently being held at the Donald Wyatt Detention Center located in Central Falls, Rhode Island. Mr. Carr is further currently among a group of people the Center for Disease Control and Prevention (hereinafter the CDC), has categorized as most at risk for contracting and suffering increased complications from COVID-19, a dangerous virus speading throughout the tri-state area and the world. See, Ex. B.

The pandemic's effect on the community, which limits people's right to congregate and the virus's potential effects upon Mr. Carr, uniquely and significantly reduces the likelihood of Mr. Carr engaging in any illegal conduct as that at issue in the second superseding indictment. It is also noteworthy that the risks associated with travel, together with failing to self-quarantine and abide by self-distancing in the home, near health care providers, significantly reduces the likelihood of Mr. Carr fleeing and failing to appear in Court. His further release would help prevent further spread of the virus in jail. Further, Mr. Carr's release would allow him to obtain needed treatment as will be discussed.

1.

The Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." See, 18 USC Section 3142(i).

New Information in Support of this Renewed Motion

After the filing of our first motion for "Emergency Motion for Temporary Release from Custody" on or about April 12th, 2020, the Defendant, Frank Carr, obtained a medical report written by Dr. Edward A. Blanchette, explaining Mr. Carr's "chronic cardiovascular pathologies" after the doctor was able to review Mr. Carr's Yale New Haven Hospital records just recently obtained. See, Ex. C. From age eight, Mr. Carr underwent a resection of an aortic coarctation which was followed by a cardiac catherization in 1977 to determine adequacy of repair. A bicuspic arotic valve was found affecting systolic pressure and a left ventricular hypertrophy. See, Ex. C.

Mr. Carr has an enlarged heart. See, Ex. D, E. This condition causes shortness of breath, chest pain, feeling of dizziness or fainting, and rapid heart beat, or pounding or fluttering sensation. See, Ex. E. He was suppose to get a cardiac MRI but it was never done. See, Ex. C.

The doctor further notes that Mr. Carr has a bicuspid aortic valve issue causing impaired left ventrical systolic function. He suggests the possible need for PDA, or heart cathesterization. See, Ex. F. The doctor further notes that Mr. Carr "requires episodic cardiology evaluation". See, Ex. C. Defendant includes the Yale records for this Court's inspection. See, Ex. G. (Filed Under Seal).

Mr. Carr has been going to medical experiencing shortness of breath and heart pain. In the older medical records from Yale, or Ex. G (p.9), it is also shown that Mr. Carr experienced a collapsed lung from a gunshot wound. See, Ex. H. So, in any event, Mr. Carr needs cardiac care that he is not getting while incarcerated. This is something that is made clear by the new report summarizing the Yale records. See, Ex. C. This is a change in circumstances in that we did not know that Mr. Carr had a

2.

condition that (is)was not being treated - the need for episodic cardiac care. In fact, the doctor asks for help as to further treat Mr. Carr. See, Ex. C. If released, Mr. Carr would be able to be followed by a cardiac doctor and to obtain the treatment he needs, including heart caterization if necessary. In any event, he would be able to get cardiac followup care which he is currently lacking.

Mr. Carr is at an extremely heightened risk of exposure to COVID-19 while incarcerated at Wyatt Correctional Institution. Mr. Carr has other underlying chronic medical conditions that make him more susceptible to COVID-19. Second, he has been diagnosed with hypertension. High blood pressure often compromises the immune system. See, Ex. I. It is unclear whether Mr. Carr's high blood pressure is caused by this heart problems or not. He has an enlarged heart which will have adverse effects. Here, it could very well be his high blood pressure, but could also be his heart murmur. These are definite signs of coronary disease and is usually considered an independent risk factors for sudden death like heart failure and or stroke. This again, is a medical condition which is separate and distinct from Covid-19 exposure. That risk factor compounds the difficulty of Mr. Carr's present risk factor brought about by his heart condition. This affects his survival rate should be contract the virus. The Doctor in Ex. C mentions these other factors that need to be considered when weighing the affect of the virus on some-one like Mr. Carr with his chronic medical conditions.

Mr. Carr also has stage three kidney disease. People with kidney disease are also at a higher risk of getting the virus. See, Ex. J. Although the Judicial Authority noted, quite specifically, that kidney disease places a person most at risk if he/she is on dialysis. This counsel and the defendant do agree. What the Defendant wants to stress to the Judicial Authority that this condition, which too is chronic, is not reversible or curable. This simply means it is one other factor to take into consideration when anticipating the Covid-19's affect on Mr. Carr's immune system should he contract the virus. Further, the stress of worry of contracting the disease is also known to be a contributing factor to suppress the

immune system. See, Ex. J.

Mr. Carr similarly has a history of drug addiction. This compromises the immune system and has an affect on the lungs. See, Ex. K. Mr. Carr has, due to his heart condition, a history of irregular heart beats on his EKGs. Last, Mr. Carr states that he was shot in the past and suffered from a collapsed lung. See, Ex. G(p.9), which include the older Yale New Haven medical records which form the basis for the newer jail report, or Ex. C by Dr. Blanchette. All these records indicate several chronic conditions which place Mr. Carr at significant risk while he is incarcerated at the Wyatt Correctional Institution. Hence, with the new report and lack of evidence of improved conditons at the Facility, it appears this renewed motion has merit and should be seriously considered by the Judicial Authority.

FACTS

Mr. Carr is charged in Count One of a Second Superseding Indictment with conspiracy to possess with intent to distribute 28 grams of a mixture and substance containing a detectable amount of cocaine base, in violation of Title 21, USC Sections 846, 841(a)(1), and 841(b)(1)(B)(ii), and 500 grams of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, USC Sections 846, 841(a)(1) and 841(b)(1)(B)(ii). In Counts Six and Seven of the Second Superseding Indictment, Mr. Carr is also charged with possession with intent to distribute 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of Title 21, USC Sections 841(a)(1) and 841(b)(1)(B)(iii). In addition, in Count One of the Second Superseding Indict-ment, Mr. Carr is also charged with conspiracy to possess with intent to distribute heroin, in violation of Title 21, USC, Sections 846, 841(a)(1) and 841(b)(1)(C). Mr. Carr is also charged in Count Four with possession with intent to distribute and distribution of cocaine and cocaine base, in Count Five with possession with intent to distribute and distribution of cocaine, and in Count Eight with possession with intent to distribute and distribution of cocaine base and heroine, each alleged to be in violation of

Title 21, USC Sections 841(a)(1) and 841(b)(1)(C). Further, on or about March 2nd, 2020, Mr. Carr was also charged with a second offender information pursuant to 21 USC Section 851 whereby the Government intends to rely upon a prior conviction that subjects the Defendant to an enhanced penalty pursuant to 21 USC Sections 841(b)(1)(B) and (C).

On or about July 10th, 2019, Magistrate Judge Spector granted the Government's motion for detention. Mr. Carr pleaded not guilty to the counts alleged then and later to the Superseding Indictment on or about March 13th, 2020 before Judge Spector in New Haven Federal District Court. Although a motion for bail had been filed, it was never pursued. The Government's position had been maintained that with Mr. Carr's criminal history, and with the strenghth of the Government's case, that the Defendant could not rebut their position that no condition or combination of conditions could reasonably assure the Defendant's appearance in court or the safety of the community.

A VERY UNIQUE CHANGE OF CIRCUMSTANCES WITH THE VIRUS OUTBREAK-COVID-19

As of April 11th, of 2020, a new strain of coronavirus which has mutated now causes COVID-19, which has infected over 1,724,736 people, leading to at least 104,938 deaths worldwide. (See, Coronavirus (Covid-19)- Google News,(April 11, 2020) at https://news.google.com/covid19/man?hl=en-US&gl=USen. See, Ex. L. Since March 27th, 2020, the numbers have increased immensely. Governors in New York, Connecticut, Rhode Island, and Massachusetts have all declared a State of Emergency, as has the President on the national level. We all have been advised to take protective measures, including but not limited to, "shelter at home, close schools, close all non-essential businesses, and restrict all group meetings or gatherings. At present, despite limited testing statistics, the number of positive cases and confirmed deaths associated with COVID-19 have increased exponentially, especially with states like New York which has suffered the drastic effects of the outbreak with no end in sight.

Further, the CDC has issued guidance pertaining to people who are at a higher risk of contracting

5.

COVID-19: Senior over sixty years old; People with chronic medical conditions like heart disease, lung disease, diabetes, high blood pressure, and kidney disease(should take preventive measures to stay at home and stay away from crowds). (See, People at Risk for Serious Illness from COVID-19, CDC (March 12, 2020) at https://bit.ly/2vgUt1P). See, Ex. D. With the number of confirmed cases in Connecticut, Rhode Island and all New England that indicate community spread, vigilance requires everyone to take every possible step and precaution to mitigate the epidemic's effects and to protect vulnerable populations. See, Ex. M, "where the virus has rapidly moved up the list of Rhode Island's leading causes of death, and if the projections hold, it could find itself in the top five when all is said and done". Since the facility is in Rhode Island, and since officers and staff come and go, we have an obligation to protect those who simply cannot protect themselves.

SPREAD OF COVID-19 IN RELATION TO CONDITIONS OF CONFINEMENT

The conditions of confinement create an increased prevalence of infectious diseases such as HIV, Hepatitis C Virus Infections and Tuberculosis. (Perspective-Flattening the Curve for Incarcerated Populations-Covid-19 in Jails and Prisons, The New England Journal of Medicine, April 2, 2020, by Matthew J. Akiyama, MD, Anne C. Spaulding, MD, and Josiah D. Rich, MD). See, Ex. N. Highly transmissable novel respiratory pathogens pose a new challenge for incarcerated populations because of the ease with which they spread in congregate settings. Perhaps most relevant to the COVID-19 pandemic, the 2009 H1N1 influenza pandemic exposed the failure to include jails in planning effort. By the spring of 2010, vaccine was plentiful, yet most small jails never received vaccine, despite the presence of high-risk persons, such as pregnant women, and the increased risk of transmission among unvaccinated persons who spent time detained in close-proximity to one another. Id. See, Ex. N.

To date, the Federal Bureau of Prisons and certain state and municipalities have opted to suspend visitation by community members, limits by legal representatives, and reduce facility transfers for

inmates. To reduce social isolation and maintain a degree of connectedness for inmates, some institutions are providing teleconferencing services for personal and legal visits. Unfortunately, correctional staff will continue to enter and leave the facilities. This has resulted in people and especially inmates being diagnosed with Covid-19. A recent SARS-CoV-2 outbreak among cruise-ship passengers and crew in Yokohama, Japan provides a warning about what could happen in our correctional settings. See, Ex. F. It is true that mitigation is often a good response, but unfortunately, we are past that approach. Therefore, the best approach now is "decarcerating, or releasing, as many people as possible, focusing on those who are least likely to commit addional crimes, but also on the elderly and infirm". Id. See, Ex. N.

Inmates with chronic diseases are especially vulnerable. The state or the government may have an interest in punishing the offender, but when a person's life is at issue, the punishment needs to be re-evaluated. In Mr. Carr's case, he is unsentenced and exposed while incarcerated at Wyatt or any Correctional Institution - for that matter. His detention has now crossed over to punishment in light of the pandemic and his chronic conditions making him an unfortunate target with little hope should he be exposed. The risk of exposure in light of Mr. Carr's medical conditions make the risk unreasonable. Further, Mr. Carr is unable to get acceptable medical treatment absent the risk.

CONDITIONS OF CONFINEMENT AT WYATT CORRECTIONAL INSTITUTION

Chief US District Court Judge Underhill has acknowledged the state and federal governments' declaration of emergency, and has acted accordingly. He has limited court business in an effort to take precautionary measures. He has postponed trials and has limited business to minize contact between staff and litigants. He has restricted visitor to the Courthouses, and placed certain limits on trials, hearings, etc. He has suspended compliance hearings, attorney admissions, and probation visits except by video conferencing. He has encourage the filing of motions to obtain early release for

inmates at risk who are close to completing their sentences. Further, the Court is aware of April 27th, 2020 Covid-19 Superseding General Order Re: Court Operations.

At Wyatt, like any detention facility, the screening of inmates is relevant because of self-quaranting and social distancing requirements. This is not possible at Wyatt. In a recent ruling on a similar motion, Judge Meyer wrote the following relevant to conditions at Wyatt in support of his decision to release an inmate to home confinement with underlying medical conditions like Mr. Carr. The inmate was released with electronic monitoring. The Court, per Judge Meyer stated:

> Although I understand that no one has yet tested positive for the virus at Wyatt and I credit the Government's representations about the precaution being taken by Wyatt personnel, this does not change the fact that Fellela continues to be subject to close quarters confinement at Wyatt. According to an inquiry through the U.S. Marshals Service of the Wyatt facility, there are more than 700 prisoners housed at Wyatt of which more than 500 prisoners are housed in two-person cells and more than 150 prisoners are housed in more-than-two person cells. There are between 20 to 70 persons at one time in general dayroom areas, and up to 15 persons allowed in the recreation area at one time.
>
> All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another. But, as is true for most jails and prisons, the conditions of confinement at Wyall are not compatible with these safeguards.

See, United States v. Fellela, Case Nos. 3:19CR79 and 3:19CR158(JAM)(D. Conn. March 20, 2020).

See, Ex. O. Judge Thompson ordered a similar release of a federal criminal defendant in United States v. Shaun Hawkins, Case No. 3:19CR229(AWT), ECF No. 23. See, Ex. P.

Further, the Wyatt Detention Center has the following announcement on its website, relative to the COVID-19 pandemic and family and friend visits:

> Due to the ongoing concerns regarding the potential exposure of the Coronavirus (COVID-19) we are suspending ALL detainee visitation with families/friends for an additional two (2) week period beginning Tuesday, March 31st, 2020 through Tuesday,

April 14th, 2020. We will re-evaluate the status of this Pandemic on April 14, 2020. See, Donald W. Wyatt Detention Facility Web-Site.

This clearly illustrates the need for caution. While attorney visits have not been suspended at Wyatt, the undersigned counsel has been self-quarantining and social distancing himself at his home, while his staff have also been working remotely from their homes. Since this counsel is over sixty-five, and since this counsel has chronic conditions, he is seeking to avoid any contact which could bring about exposure to this potentially lethal virus. Further, this counsel is clearly afraid of any potential exposure Mr. Carr faces while held at Wyatt Detention Center. Recent reporting has stressed how individuals could be carriers without experiencing symptoms of COVID-19. This screams caution as attorneys and correctional staff are allowed in and out of the facility despite the potential risk of carrying the virus into the facility. Mr. Carr's exposure, in light of his medical history, could result in a death sentence.

This unprecedented, unexpected COVID-19 pandemic and its impact on the jails, unfortunately, presents an inherent risk to Mr. Carr's health should he contract the virus. This situation also impacts Mr. Carr's ability to prepare his defenses to the alleged crimes. United States District Judge Nathan determined these changed circumstances to be two-fold. The first factor related to new information about the strength of the Government's case. The second related to, "the unprecedented and extraordinary dangerous nature of the COVID-19 pandemic" as it related to the health of the Defendant, and his ability to prepare a defense, in the context of being incarcerated:

Although there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop. See, e.g., Joseph A. Bick, Infection Control in Jails and Prisons, 45 Clinical Infectious Disease 1047, 1047 (Oct. 2007), ttps://doi.org/10.1086/521910 (noting that in jails "the probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); see also Claudia Lauer & Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, Associated Press

(Mar. 7, 2020). The magnitude of this risk has grown exponentially since
the March 6th hearing before the Court; at the end of the day on March 6,
New York State had 44 confirmed cases of COVID-19, see Andrew Cuomo
(@NYGovCuomo), Twitter (March 6, 2020, 4:51 PM), https://twitter.com/
NYGovCuomo/status/1236046668220567553, but by the end of the day on
March 18, that number had climbed to 2,382, see, Mitch Smith, et. al.,
Tracking Every Coronovirus Case in the U.S.: Full Map, N.Y. Times, March
18, 2020, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.
html.

Though the BOP has admirably put transmission mitigation measures
in place, see Federal Bureau of Prisons, Federal Bureau of Prisons
COVID-19 Action Plan, https://www.bop.gov/resources/news/20200313_
covid-19.jsp, in the event of an outbreak at the Metropolitan Correctional
Center ("MCC")(where the Defendant is currently being detained), substan-
tial medical and security challenges would almost certainly arise. A compre-
hensive view of the danger the Defendant poses to the community requires
considering all factors-including this one-on a case-by-case basis. See,
e.g., United States v. Raihan, No. 20-cr-68(BMC)(JO), Dkt. No. 20 at
10:12-19(E.D.N.Y. Mar. 12, 2020)(deciding to continue a criminal
defendant on pretrial release rather than order him remanded to the
Metropolitan Detention Center due, in part, to the Magistrate Judge's
recognition of the fact that "the more people we crowd into that facilty, the
more we're increasing the risk to the community").

See, United States v. Stephens, Case No. 15-cr-95 (AJN) (S.D.N.Y. Mar. 18, 2020). See, Ex. Q.

In Mr. Carr's case, it is true that he has a violent crime on his record. Said crime is approximately

twenty years old. He has no prior violent crimes from that date forward. Taken all of this together,

in light of the Coronavirus, and the need for social distancing, Mr. Carr could be released to a cousin

who remains home working from her residence. There is room in the home and Mr. Carr would be

close to area hospitals should the need for medical attention arise. With these change of circumstances,

the Defendant believes these conditions necessitate a reconsideration of the Court's prior ruling.

Mr. Carr does not pose a threat to the community and Defendant believes in light of the current

COVID-19 situation, he can be safely released to a custodian with appropriate electronic monitoring.

Further, 18 USC Section 3142(i) provides for the temporary release of a detained defendant where

a 'compelling reason" necessitates such a release. A compelling reason exists where the Defendant's

10.

serious medical conditions warrant release. See, <u>United States v. Rebollo-Andino</u>, 312 F. App'x 346, 348 (1st Cor/ 2009)(explaining that a defendant who is denied bail 'retains the ability to request, in extraordinary circumstances, temporary release under Section 3142(i) should future developments with respect to his medical conditions so warrant). See, <u>United States v. Birbragher</u>, No. 07cr-1023-(LRR), 2008 WL 1883504, at *2 (N.D. Iowa Apr. 25, 2008)(describing <u>United States v. Scarpa</u>, 815 F. Supp. 88 (E.D.N.Y. 1993), and <u>United States v. Cordero Caraballo</u>, 185 Supp. 2d 143 (D.P.R. 2002), as cases in which the courts have found 'compelling reason' to temporarily release defendants due to their serious medical issues). See, Ex. Q.

Last, Mr. Carr has very strong family support. Two letters were written from family members, which this counsel would like to include for the Judicial Authority's inspection. See, Ex. R and S. Both letters reiterate the fact that Mr. Carr has medical issues, and both seem to clearly support Mr. Carr in this matter. If anything else, it does illustrate family support and strong ties to the community

<u>CONCLUSION</u>

The bail reform act requires Mr. Carr's release. Due to the pandemic, he has compelling reasons to be released. The circumstances that existed when Mr. Carr was ordered detained have now changed. This pandemic poses a direct risk that is far greater to Mr. Carr if he continues to be detained with his heart/hypertension, his kidney disease, and his lung and drug issues. Further, Mr. Carr's continued incarceration poses now an even greater risk to the incarcerated population and his jailers should he become infected. It cannot be denied that the required episodic cardiac review required to keep Mr. Carr healthy and stable cannot be done while he is incarcerated. The pandemic makes this impossible.

Liberty is the norm and "detention prior to trial or without trials is the carefully limited exception." See, <u>United States v. Salerno</u>, 481 U.S. 739, 755(1987). One charged with a crime is, after all, presumed innocent. See, <u>Stack v. Boyle</u>, 342 U.S. 1, 4 (1951). Further, the courts have long recognized

that there is no greater necessity than keeping a defendant alive, no matter the charge. As Judge

Weinstein held, "We do not punish those who have not been proven guilty. When we do punish, we

do not act cruelly. Continued incarceration of this terminally ill defendant threatens both of these

fundamental characteristics of our democracy". See, United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y.

1993)(pretrial defendant with AIDS facing murder charges released on bail because of the "un-

acceptably high risk of infection and death on a daily basis inside of MCC"). The Court here should

reconsider the "total harm and benefits to prisoner and society"that continued pretrial imprisonment of

Mr. Carr will yield, relative to the heightened health risks posed to him during this rampant pandemic.

See, Davis v. Ayala, 135 S. Ct. 2187, 2209 (2015)(Justice Kennedy concurring)(calling for heightened

Judicial Scrutiny of the projected impact of jail and prison conditions on a defendant); See, United

States v Mateo, 299 F. Supp. 2d 201, 212 (S..N.Y. 2004)(reducing sentence where defendant's pretrial

conditions were "qualitatively more severe in kind and degree than the prospect of such experiences

reasonably foreseeable in the ordinary cases").

    The Defendant has alleged conditions of release that are available to him and at the same time

are conditions that limit any further threat to him or the community. Any risk of danger to the commun-

ity is also significantly limited by the extent to which the pandemic would limit Mr. Carr's movement

in the community or interaction with others. He would be confined to the home with electronic mon-

itoring. He has support of his family. He is in need of cardiac follow-up with Court approval.

    Since the circumstances that originally existed when Mr.. Carr was ordered detained have now

changed, the Court should consider how this pandemic poses a direct risk to the Defendant and how

that risk is far greater should he be continued detained. Moreover, the number of people in detention

facilities is now an urgent matter creating a national emergency. Releasing people who are now non-

violent and uniquely vulnerable themselves, is critical to minimize the number of people who face

that risk and to reduce the density of detention facility populations. People who contract the virus will need urgent medical care, Jails simply do not have the medical resouces or capacity to deal with the spread of this virus. "Decarcerating," or releasing, as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm; urging police and courts to immediately suspend arresting and sentencing people, as much as possible, for low-level crimes and misdemeanors; isolating and separating incarcerated persons who are infected and those who are seriously ill; and identifying correctional staff and health care providers who became infected early and have recovered, who can help with the custodial and care efforts once they have been cleared, since they may have some degree of immunity and severe staff shortages are likely. See, "Perspective Flattening the Curve for Incerated Populations-Covid-19 in Jails and Prisons, by Akiyama, MD, Spaulding, MD, and Rich, MD., The New England Journal of Medicine, April 2nd, 2020. See, Ex. N.

Defendant seeks reconsideration and an immediate emergency release, due to COVID-19 and his current medical issues in light of the new report filed. Defendant believes reconsideration is warranted under these circumstances.

RESPECTFULLY SUBMITTED,

THE DEFENDANT, FRANK CARR,

BY _____

Frank P. Cannatelli
8 Research Parkway
Wallingford, Conn.
06492
Phone: (203) 949-1650
Fax: (203) 949-1660
Fed. Bar. # 04394
Email: Cannatellilaw@aol.com

13.

## LIST OF EXHIBITS

1. Exhibit A.................................................Judge's Order of April 17, 2020- 1 page

2. Exhibit B.................................................CDC Report of May 6th, 2020 - 3 pages

3. Exhibit C.................(sealed)........................Dr. Blanchette Report of April 10, 2020-1 page

4. Exhibit D.................................................What Heart Patients need to know. ........1 page

5. Exhibit E.................................................Left Vent. Hypertrophy...........................2 pages

6. Exhibit F.................................................Patent Ductus Arteriosus (PDA)............1 page

7. Exhibit G.................(sealed)........................Heart Kidney dated 02/07/18................1-3 page
      Detail Heart/Kidney"            " .............4-6 page
      Pediactric Records.01/25/82.................7-8 page
      Gun/Shot/Wound  12/28/95.................  9 page

8. Exibit H...................................................Pneumothorax....................................1 page

9. Exhibit I....................................................Covid-19 /High Blood Pressure...............3 page

10. Exhibit J..................................................Covid-19/PKD.....................................6 page

11. Exhibit K..................................................Covid-19/Drug Abuse............................3 page

12. Exhibit L...................................................Google News.......................................1 page

13. Exhibit M..................................................Covid-19/Rhode Island..........................2 page

14. Exhibit N...................................................Flattening the Curve..,............................5 page

15. Exhibit O..................................................USA v. Fellela.......................................3 page

16. Exhibit P...................................................USA v. Hawkins....................................1 page

17. Exhibit Q..................................................USA v. Stephens.................................. 7 page

18. Exhibit R...................................................letter....................................................1 page

19. Exhibit S...................................................leter.....................................................1 page

End of Exhibits.

(Exhibits C and G are filed under seal).

## CERTIFICATE OF SERVICE

I Frank P. Cannatelli, hereby certify that on May 7th, 2020, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing. Parties may access this filing through the Court's CM/ECF System.

_Fr Cannatelli_
Frank P. Cannatelli

14.