The NEW ENGLAND JOURNAL of MEDICINE

# Perspective

# Flattening the Curve for Incarcerated Populations — Covid-19 in Jails and Prisons

Matthew J. Akiyama, M.D., Anne C. Spaulding, M.D., and Josiah D. Rich, M.D.

April 2, 2020
DOI: 10.1056/NEJMp2005687

Article

Metrics

5 References

## Article

**B**ECAUSE OF POLICIES OF MASS INCARCERATION OVER THE PAST FOUR DECADES, THE United States has incarcerated more people than any other country on Earth. As of the end of 2016, there were nearly 2.2 million people in U.S. prisons and jails.[1] People entering jails are among the most vulnerable in our society, and during incarceration, that vulnerability is exacerbated by restricted movement, confined spaces, and limited medical care. People caught up in the U.S. justice system have already been affected by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), and improved preparation is essential to minimizing the impact of this pandemic on incarcerated persons, correctional staff, and surrounding communities.

Populations involved with the criminal justice system have an increased prevalence of infectious diseases such as HIV and hepatitis C virus (HCV) infections and tuberculosis. Disparities in social determinants of health affecting groups that are disproportionately likely to be incarcerated — racial minorities, persons who are unstably housed, persons with substance use disorders or mental illness — lead to greater concentrations of these illnesses in incarcerated populations. Yet implementation of interventions to address these conditions is often challenging in correctional settings owing to resource limitations and

policy constraints. Therefore, comprehensive responses that straddle correctional facilities and the community often need to be devised.

**Sign up for the Weekly Table of Contents email.**

Each week, receive an email with links to the articles published in the current week's issue of the *New England Journal of Medicine*.

SIGN UP

For example, HCV, which is the most prevalent infectious disease in incarcerated populations, is most commonly spread through injection drug use. Transmission can be reduced using measures known to reduce high-risk behaviors, such as opioid agonist therapy and syringe exchange. Although much of the country has yet to implement these strategies in correctional settings, managing transitions in care to and from the community and providing such services to people after incarceration has a large impact. Similarly, we have learned that controlling infections such as HIV and HCV in correctional settings can have positive effects both in these settings and on surrounding communities, as a form of treatment as prevention.

Highly transmissible novel respiratory pathogens pose a new challenge for incarcerated populations because of the ease with which they spread in congregate settings. Perhaps most relevant to the Covid-19 pandemic, the 2009 H1N1 influenza pandemic exposed the failure to include jails in planning efforts. By the spring of 2010, vaccine was plentiful, yet most small jails never received vaccine, despite the presence of high-risk persons, such as pregnant women, and the increased risk of transmission among unvaccinated persons who spent time detained in close proximity to one another.[2]

"Social distancing" is a strategy for reducing transmission and "flattening the curve" of cases entering the health care system. Although correctional facilities face risks similar to those of community health care systems, social distancing is extremely challenging in these settings. Furthermore, half of all incarcerated persons have at least one chronic disease,[3] and according to the U.S. Department of Justice, 81,600 the age of 60, factors that increase the risk of poor outcomes of infection. With limited ability to themselves and others by self-isolating, hundreds of thousands of susceptible people are at heightened risk for severe illness.

To date, the Federal Bureau of Prisons and certain states and municipalities have opted to suspend visitation by community members, limit visits by legal representatives, and reduce facility transfers for incarcerated persons. To reduce social isolation and maintain a degree of connectedness for incarcerated people, some correctional systems are providing teleconferencing services for personal and legal visits. Irrespective of these interventions, infected persons — including staff members — will continue to enter correctional settings. By March 14, some U.S. correctional staff members had tested positive for SARS-CoV-2, and the first Covid-19 diagnosis in a detained person was announced on March 16. A recent SARS-CoV-2

outbreak among cruise-ship passengers and crew in Yokohama, Japan, provides a warning about what could soon happen in correctional settings.[4]

To operationalize a response for incarcerated populations, three levels of preparedness need to be addressed: the virus should be delayed as much as possible from entering correctional settings; if it is already in circulation, it should be controlled; and jails and prisons should prepare to deal with a high burden of disease. The better the mitigation job done by legal, public health, and correctional health partnerships, the lighter the burden correctional facilities and their surrounding communities will bear. We have learned from other epidemics, such as the 1918 influenza pandemic, that nonpharmaceutical interventions are effective, but they have the greatest impact when implemented early.[5]

Therefore, we believe that we need to prepare now, by "decarcerating," or releasing, as many people as possible, focusing on those who are least likely to commit additional crimes, but also on the elderly and infirm; urging police and courts to immediately suspend arresting and sentencing people, as much as possible, for low-level crimes and misdemeanors; isolating and separating incarcerated persons who are infected and those who are under investigation for possible infection from the general prison population; hospitalizing those who are seriously ill; and identifying correctional staff and health care providers who became infected early and have recovered, who can help with custodial and care efforts once they have been cleared, since they may have some degree of immunity and severe staff shortages are likely.

All these interventions will help to flatten the curve of Covid-19 cases among incarcerated populations and limit the impact of transmission both inside correctional facilities and in the community after incarcerated people are released. Such measures will also reduce the burden on the correctional system in terms of stabilizing and transferring critically ill patients, as well as the burden on the community health care system to which such patients will be sent. Each person needlessly infected in a correctional setting who develops severe illness will be one too many.

Beyond federal, state, and local action, we need to consider the impact of correctional facilities in the global context. The boundaries between communities and correctional institutions are porous, as borders between countries in the age of mass human travel. Despite security at nearly every nation, Covid-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country. Thus far, we have witnessed a spectrum of epidemic responses from various countries when it comes to correctional institutions. Iran, for example, orchestrated the controlled release of more than 70,000 prisoners, which may help "bend the curve" of the Iranian epidemic. Conversely, failure to calm incarcerated populations in Italy led to widespread rioting in Italian prisons. Reports have also emerged of incarceration of exposed persons for violating quarantine, a practice that will exacerbate the very problem we are trying to mitigate. To respond to this global crisis, we need to consider prisons and jails as reservoirs that could lead to epidemic resurgence if the epidemic is not adequately addressed in these facilities everywhere.

As with general epidemic preparedness, the Covid-19 pandemic will teach us valuable lessons for preparedness in correctional settings. It will also invariably highlight the injustice and inequality in the United States that are magnified in the criminal justice system. As U.S. criminal justice reform continues to unfold, emerging communicable diseases and our ability to combat them need to be taken into account. To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.

## Funding and Disclosures

Disclosure forms provided by the authors are available at NEJM.org.

This article was published on April 2, 2020, at NEJM.org.

## Author Affiliations

From the Department of Medicine, Divisions of General Internal Medicine and Infectious Diseases, Albert Einstein College of Medicine and Montefiore Medical Center, Bronx, NY (M.J.A.); the Department of Epidemiology, Rollins School of Public Health, Emory University, Atlanta (A.C.S.); and the Departments of Medicine and Epidemiology, Division of Infectious Diseases, Brown University and the Miriam Hospital, Providence, RI (J.D.R.).

## Supplementary Material

| Disclosure Forms | PDF | 146KB |

Full Text
Help

## References (5)

1. Kaeble D, Cowhig M. Correctional populations in the United States, 2016. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, April 2018 (https://www.bjs.gov/content/pub/pdf/cpus16.pdf).
   Google Scholar

2. Lee AS, Berendes DM, Seib K, et al. Distribution of A(H1N1)pdm09 influenza vaccine: need for greater consideration of smaller jails. J Correct Health Care 2014;20:228-239.
   Crossref   Medline   Google Scholar

3. Maruschak LM, Berzofsky M, Unangst J. Medical problems of state and federal prisoners and jail inmates, 2011–12. Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics. February 2015 (https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf).
   Google Scholar

4. Kakimoto K, Kamiya H, Yamagishi T, Matsui T, Suzuki M, Wakita T. Initial investigation of transmission of COVID-19 among crew members during quarantine of a cruise ship — Yokohama, Japan, February 2020. MMWR Morb Mortal Wkly Rep 2020;69:312-313.
   Crossref   Medline   Google Scholar

5. Hatchett RJ, Mecher CE, Lipsitch M. Public health interventions and epidemic intensity during the 1918 influenza pandemic. Proc Natl Acad Sci USA 2007;104:7582-7587.
   Crossref   Web of Science   Medline   Google Scholar

Close References

**More about**   VIRAL INFECTIONS   GLOBAL HEALTH   HEALTH LAW   PUBLIC HEALTH

MEDICAL PRACTICE, TRAINING, AND EDUCATION   MEDICAL ETHICS

### More from the week of April 9, 2020

IGINAL ARTICLE
lumetinib in Children with Inoperable Plexiform Neurofibromas
A. Gross and Others

ORIGINAL ARTICLE
Physical Therapy versus G
G.D. Deyle and Others

Full Text
Help

Exh. O

# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.                                                                  No. 3:19-cr-79 (JAM)

HENRY A. FELLELA, JR.,
    *Defendant.*

## ORDER GRANTING EMERGENCY MOTION
## FOR TEMPORARY RELEASE FROM CUSTODY

Defendant Henry A. Fellela, Jr., is currently detained at the Donald W. Wyatt Detention facility in Rhode Island. He is awaiting sentencing following his plea of guilty to federal charges of access device fraud and aggravated identity theft, as well as sentencing for violation of the conditions of supervised release from a prior federal criminal conviction. Fellela has a lengthy history of property crimes, mostly involving credit card fraud and larceny.

Fellela has filed an emergency motion for release from custody in light of his peculiar vulnerability to harm from the COVID-19 virus that is presently the subject of a rapidly escalating global pandemic. Fellela is 62 years old, weighs 300 pounds, and is afflicted with diabetes among several other ailments. His age, physical, and medical condition make him within the highest risk group of death if he were to become infected with the COVID-19 virus.[1]

In accordance with my oral ruling following a teleconference hearing today and in light of my consideration of the entire record in this case to date, I will grant the emergency motion for release. Although I understand that no one has yet tested positive for the virus at Wyatt and I

---

[1] *See* Centers for Disease Control and Prevention, *Coronavirus Disease (COVID-19) – How to Protect Yourself* (noting with warning exclamation point that "[o]lder adults and people who have severe underlying chronic medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness"), *available at* https://www.cdc.gov/coronavirus/2019-ncov/prepare/prevention.html (last accessed Mar. 20, 2020). The CDC's webpage goes on to state "[p]ut distance between yourself and other people if COVID-19 is spreading in your community. This is especially important for people who are at higher risk of getting very sick." *Ibid.* (emphasis omit).

1

credit the Government's representations about the precaution being taken by Wyatt personnel, this does not change the fact that Fellela continues to be subject to close quarters confinement at Wyatt. According to an inquiry through the U.S. Marshals Service of the Wyatt facility, there are more than 700 prisoners housed at Wyatt of which more than 500 prisoners are housed in two-person cells and more than 150 prisoners are housed in more-than-two-person cells. There are between 20 to 70 persons at one time in general dayroom areas, and up to 15 persons are allowed in the recreation area at one time.

All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another. But, as is true for most jails and prisons, the conditions of confinement at Wyatt are not compatible with these safeguards.

In any event, Fellela's motion requires me to consider whether he has established by clear and convincing evidence that he will not flee or pose a danger to any other person or to the community. *See* 18 U.S.C. § 3143(a)(1); Fed. R. Crim. P. 32.1(a)(6). I conclude that he has done so, provided that he is subject to continuous home confinement with electronic monitoring. He has shown he would not flee. Flight would be enormously more risky and complicated in light of the travel and commercial restrictions brought on by the COVID-19 virus. He has also shown that he is not a genuine risk to commit more of the kinds of crimes he has engaged in before. So far as I can tell from the presentence report, his crimes have depended on him being at large outside his house and in the community rather than subject to electronic lockdown at home. The current COVID-19 environment of restricted travel and commercial activities would make it that much more difficult for any attempted fraud activities to succeed.[2]

---

[2] In view that I have determined that Fellela is subject to release in accordance with the explicit requirements of 18 U.S.C. § 3143(a)(1), I need not further determine whether the COVID-19 virus presents a "compelling reason" for

I have received adequate assurance including through inquiry of the U.S. Probation Office in Rhode Island that Fellela can be subject to 24-hour electronic monitoring if released to his home and custody of his spouse in Rhode Island. Fellela will be permitted to leave his home only for a health or medical emergency and for no other reason absent written permission of the U.S. Probation Office. Of course, if Fellela decides to disregard the conditions of electronic home confinement, then he should understand that he would likely be detained again and he would fully assume the risk to his health that may result.

This matter is referred to U.S. Magistrate Judge Robert M. Spector for entry of an order of release on Monday, March 23, 2020, and which release conditions shall include 24-hour home confinement subject to continuous electronic monitoring along with other conditions of release consistent with those proposed by Fellela in his motion and as modified or adjusted in Judge Spector's discretion.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendant's motion for emergency release from custody pending sentencing and in accordance with the order of release to be entered on March 23, 2020, by U.S. Magistrate Judge Robert M. Spector.

Dated at New Haven this 20th day of March 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

release pursuant to 18 U.S.C. § 3142(i) or an "exceptional reason" for release pursuant to 18 U.S.C. § 3145(c), or the extent to which these statutes apply at all to a defendant who is subject to release pending sentencing under 18 U.S.C. § 3143(a)(1).

3

Exh. P

From: CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>
Sent: Thursday, March 19, 2020 11:54 AM
To: CMECF@ctd.uscourts.gov
Subject: Activity in Case 3:19-cr-00229-AWT USA v. Hawkins Order on Motion for Release from Custody

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

District of Connecticut

**Notice of Electronic Filing**

The following transaction was entered on 3/19/2020 at 11:54 AM EDT and filed on 3/19/2020
**Case Name:**       USA v. Hawkins
**Case Number:**     3:19-cr-00229-AWT
**Filer:**
**Document Number:** 23(No document attached)

**Docket Text:**
ORDER: The Emergency Motion for Release on Bond (ECF No. [21]) as to Shaun Hawkins (1) is hereby GRANTED. Due to his special health condition, it is hereby ordered that the defendant be released immediately to the custody of Valerie Ward, and a condition of his release is that he remain in her custody. Counsel for the defendant shall contact Judge Richardson's chambers immediately so that an appropriate set of conditions of release can be put in place. It is so ordered. Signed by Judge Alvin W. Thompson on 3/19/2020. (Clough, M.)

3:19-cr-00229-AWT-1 Notice has been electronically mailed to:

1

Case 3:19-cr-00064-VLB Document 150 Filed 05/07/20 Page 10 of 44

Exh. Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

United States of America,

–v–

Dante Stephens,

           Defendant.

15-cr-95 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

    At the hearing on March 6, 2020, the Court reviewed Magistrate Judge Fox's bail determination *de novo* and concluded that the Defendant failed to establish by clear and convincing evidence that he did not pose a danger to the community. *See* March 6 Hr'g Tr. at 31:11–32:1; *see also* 18 U.S.C. § 3143(a)(1); Fed. R. Crim. P. 32.1(a); 18 U.S.C. § 3142. Accordingly, the Court ordered him remanded to the custody of the Bureau of Prisons ("BOP").

    On March 16, 2020, the Defendant filed an emergency motion for reconsideration of his bail conditions. *See* Dkt. No. 2789-1. The Court GRANTS that motion and orders the Defendant released subject to the additional conditions of 24-hour home incarceration and electronic location monitoring as directed by the Probation Department.

    The Court concludes that reconsidering the Defendant's bail conditions is appropriate in light of circumstances that have changed since the March 6 hearing. *Cf.* 18 U.S.C. § 3142(f) (A detention hearing under 18 U.S.C. § 3142 "may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community."). These changed circumstances are two-fold. First, the strength of the primary evidence relied upon by the Government to demonstrate the danger the Defendant poses to the community has been

1

undermined by new information not available to either party at the time of the March 6 hearing. Indeed, while the Government argued at the hearing that the Defendant's "possession of a loaded firearm in proximity to drugs . . . is an inherently dangerous activity" that weighed in favor of his detention, *see* March 6 Hr'g Tr. at 8:23–9:3, the Court has since learned that the arresting officer—who will not testify for the Government at the hearing on the Defendant's alleged violation of supervised release—initially identified a *different* individual as holding the bag that contained the firearm. *See* Dkt. No. 2789-1 at 2. Though the Government proffers additional evidence that it will introduce at the hearing,[1] this new information nonetheless indicates that the Government's case is weaker than it believed it to be at the March 6 hearing and bears upon the Court's prior conclusion that the Defendant failed to establish by clear and convincing evidence that he did not pose a danger to the community.

Second, since the March 6 hearing, the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic has become apparent. Although there is not yet a known outbreak among the jail and prison populations, inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); *see also* Claudia Lauer & Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, Associated Press (Mar. 7, 2020). The magnitude of this risk has grown exponentially since the March 6 hearing before this Court; at the end of the day on March 6, New York State had 44 confirmed cases of COVID-19, *see* Andrew Cuomo (@NYGovCuomo),

---

[1] The Government proffers that at the hearing it will offer, among other evidence, video surveillance footage, testimony of an NYPD officer who was present when the firearm was recovered and will testify that he recognizes the Defendant in the surveillance video as the individual carrying the bag containing the firearm, and testimony from the Defendant's Probation Officer, who will testify that she also identified the Defendant in the video as the individual carrying the bag containing the firearm.

2

Twitter (Mar. 6, 2020, 4:51 PM), https://twitter.com/NYGovCuomo/status/12360466682 20567553, but by the end of the day on March 18, that number had climbed to 2,382, *see* Mitch Smith, *et al.*, *Tracking Every Coronavirus Case in the U.S.: Full Map*, N.Y. Times, Mar. 18, 2020, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html. Though the BOP has admirably put transmission mitigation measures in place, *see* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp, in the event of an outbreak at the Metropolitan Correctional Center ("MCC") (where the Defendant is currently being detained), substantial medical and security challenges would almost certainly arise. A comprehensive view of the danger the Defendant poses to the community requires considering all factors—including this one—on a case-by-case basis. *See, e.g., United States v. Raihan*, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar. 12, 2020) (deciding to continue a criminal defendant on pretrial release rather than order him remanded to the Metropolitan Detention Center due, in part, to the Magistrate Judge's recognition of the fact that "[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

Taken together, these changed circumstances necessitate a reconsideration of the Defendant's bail conditions. The question of whether the Defendant had met his burden to establish by clear and convincing evidence that he did not pose a danger to the community was a close one at the March 6 hearing. Indeed, Defense counsel presented ample evidence at that hearing that aside from the arrest from which the alleged violation of supervised release arises, the Defendant does not have a violent background: no prior convictions involved violent conduct or gun charges. *See* March 6 Hr'g Tr. at 16:18–17:14. In light of the changed circumstances discussed above, the weight of the evidence now clearly and convincingly tips in the Defendant's favor. Accordingly, based on the evidence and arguments presented at the March 6 hearing coupled with the reasons stated above, the Court concludes that the Defendant has now established by clear and convincing evidence that he does not pose a danger to the community.

3

Even if the Court were to conclude that changed circumstances did not compel reconsideration of the Defendant's bond conditions, a separate statutory ground advanced by the Defendant would require his release here. 18 U.S.C. § 3142(i) provides that, where a detention order has been issued, "a judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The Government does not challenge the application of this provision—indeed, it does not address it at all in opposing the Defendant's motion, *see generally* Dkt. No. 2791—and the Court thus concludes that it applies here.

The text of Section 3142(i) provides that the Court may temporarily release a detained defendant to the custody of an "appropriate person" where a "compelling reason" necessitates such release. Compelling reasons may exist where release is necessary for the preparation of the defendant's defense, *see* 18 U.S.C. § 3142(i), or where the defendant's serious medical conditions warrant release, *see, e.g., United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)" should future developments with respect to his medical conditions so warrant); *see also United States v. Birbragher*, No. 07-cr-1023-(LRR), 2008 WL 1883504, at *2 (N.D. Iowa Apr. 25, 2008) (describing *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993), and *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002), as cases in which courts found "compelling reason" to temporarily release defendants due to the defendants' serious medical issues).[2] Furthermore, case law suggests that

---

[2] In a similar context, the Second Circuit has described "exceptional" reasons permitting the release of a defendant subject to mandatory detention—arguably a higher standard than "compelling" reasons—as those that "present a unique combination of circumstances giving rise to situations that are out of the ordinary." *United States v. DiSomma*, 951 F.2d 494, 497 (2d Cir. 1991); *see also* 18 U.S.C. § 3145 ("A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate."). The Second Circuit has explained that determining whether a given circumstance presents exceptional reasons under Section 3145 requires a case-by-case evaluation by the district judge and that the district judge's discretion is "constrained only by the language of the statute: 'exceptional reasons.'" *DiSomma*, 951 F.2d at 497.

4

family members may constitute "appropriate persons" where the defendant is released to relatives and placed under house arrest. *See Cordero Caraballo*, 185 F. Supp. 2d at 145 (releasing the defendant, who the court would have detained on dangerousness grounds, to the custody of his mother and grandmother on 24-hour house arrest due to his severe injuries). "A defendant has the burden of showing that temporary release is 'necessary . . .' under Section 3142(i)." *See United States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).

The Court concludes that the Defendant has met his burden by demonstrating at least one compelling reason that also necessitates his release under this provision. Namely, the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i). *See id.* (providing that the Court "may . . . permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent [it] determines such release to be necessary for preparation of the person's defense"). The spread of COVID-19 throughout New York State—and the country—has compelled the BOP to suspend all visits—including legal visits, except as allowed on a case-by-case basis—until further notice. *See* Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan*, https://www.bop.gov/resources/news/20200313_covid-19.jsp (explaining that "legal visits will be suspended for 30 days" nationwide and that "case-by-case accommodation will be accomplished at the local level"). This suspension impacts the Defendant's ability to prepare his defenses to the alleged violation of supervised release in advance of the merits hearing scheduled for March 25, 2020. Defense counsel represents that after contacting the MCC Legal Department to arrange legal calls with the Defendant, "the MCC did not permit a legal call to Mr. Stephens." Dkt. No. 2789-1 at 10. He further proffers that other defense counsel have faced similar obstacles in attempting to communicate with their clients. *Id.* The Government neither responds to nor contests these factual representations, and so the Court relies upon them here. *See generally* Dkt. No. 2791. Thus, the Court concludes that these circumstances necessitate the Defendant's temporary release. *See United States v. Persico*, No. 84-cr-809 (JFK), 1986 WL 3793, at *1 (S.D.N.Y. Mar. 27, 1986) (describing cases in which

5

Dated: March __18__, 2020
New York, New York

_____
ALISON J. NATHAN
United States District Judge

7

"temporary releases of defendants therein were granted prior to trial in order to facilitate the defendants' expeditious preparation for trial and thus to promote the prompt disposition of the charges against each defendant" where "[t]he concern in each case was that, given the admittedly limited access to telephones and attorney conference rooms at the detention facilities, the effective preparation of a defense might have been impossible in the short time available before the commencement of trial").[3]

The Court further concludes that the Defendant's mother constitutes an "appropriate person" within the meaning of this provision so long as the Defendant is subject to home incarceration with GPS monitoring at the residence he shares with her. *See Cordero Caraballo*, 185 F. Supp. 2d at 146 (finding that the defendant's mother and grandmother "qualif[ied] as third-party custodians" for purposes of the release of the defendant).

In sum, circumstances that have changed since the March 6 hearing warrant reconsideration of the Defendant's bail conditions, and the Court concludes that, in light of these changed circumstances, the Defendant has established by clear and convincing evidence that he does not pose a danger to the community. Furthermore, even were the Court to conclude that reconsideration was not warranted, compelling reasons would necessitate the Defendant's temporary release under 18 U.S.C. § 3142(i). Accordingly, the Court orders the Defendant released from the custody of the Bureau of Prisons to the custody of his mother, with whom he lives, subject to the additional conditions of supervised release of 24-hour home incarceration at his current residence in the Bronx and electronic location monitoring as directed by the Probation Department.

SO ORDERED.

---

[3] The Defendant also argues that the current public health crisis itself provides an additional compelling reason necessitating his release for all the reasons already articulated above. *Cf. Rebollo-Andino*, 312 F. App'x at 348 (explaining that "extraordinary circumstances" related to medical conditions may necessitate temporary release under § 3142(i)). The Court need not decide this additional factor here because its determination that release is necessary for the preparation of the Defendant's defense is sufficient under § 3142(i).

6

Exh. R

To whom it may Concern
I'm writing this letter of a concern of mines Regarding Frank Carr thats currently in Donald Wyatt Detention center. Frank been having health issues for years now and I think it gotten worst over the last 2 years I know when he got open heart surgery was some years ago and since been shot on the side and Kidney Problem and since then have high blood Pressure that he is taking medicine for has been hospitalized in 2018 I know if he was release to home I will make sure he gets to his appointment and stay out of Trouble Frank have issues that he needs to work on But I hope this letter can help you with making a decision. I know in Wyatt Detention they have over 8 positive cases of covid 19 and It's such a serious virus that I see and deal with everyday working in the hospital Operating Room

T. Monique Carr
Phone: (203) 214-0037

4/30/2020
RE: Frank Carr

Dear Judge

My name is Corey Carr I am the brother of Frank Carr i'm writing hoping you take my brother health in consideration and letting him come home I worry about his health every day Especially with this COVID-19 Frank have a bad heart ever since he was little I could remember when we will play sports he couldn't play because of his bad heart and also Frank been shot twice By he'll getting shot he also has a bad kidney so please find in your heart to grant him a medical release.

Thank you

Corey Carr
Phone: (203) 805-3296