UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        CRIMINAL NO. 3:19CR180 (RNC)

      v.

FRANK CARR             February 18, 2021

GOVERNMENT'S RESPONSE TO DEFENDANT'S
<u>MOTION FOR COMPASSIONATE RELEASE</u>

On February 10, 2021, the defendant, Frank Carr, moved *pro se* for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), due to the risks presented by the COVID-19 pandemic and his health conditions.  Doc. 1661.  On February 12, 2021, the Court appointed counsel to represent Carr and on February 12, 2021, it ordered defense counsel to file a supplemental memorandum by February 16, 2021, with the Government's reply due two days later.  Doc. 1663.   On February 16, 2021, Carr's counsel filed a Memorandum in Support of February 10, 20201 Motion for Release.  Doc. 1668 ("Supplemental Memorandum"), in which he argues at page 2 that "the Defendant's medical needs present such a reason."

Carr is serving an effective 126-month sentence on his guilty plea as a second offender to possession of 28 grams or more of crack cocaine/cocaine base and his admission that he committed that offense while on supervised release.  He has served approximately 589 days (or a little over 19 months) of that sentence.  He is currently detained at the Donald W. Wyatt Detention Facility.  However, the Government understands from the United States Marshals Service that Carr has been designated and should be moved shortly to FCI Butner within the Bureau of Prisons complex which includes the Federal Medical Center which the Government understands is a federal prison for inmates of all security levels who have special health needs and has a full hospital facility.

As an initial matter, the defendant has taken an appeal of his sentence (Doc. 1610), which

1

means that the Court of Appeals currently has jurisdiction over his case.  Accordingly, he may seek only an indicative ruling from this Court on the issue of compassionate release.  In the event this Court were inclined to grant the request, he would have to move for his case to be returned to this Court to effectuate its determination of the compassionate release request. In the event this Court were to deny the request for compassionate release (as urged by the Government), the defendant's case would remain with the Court of Appeals.

Second, the Government respectfully submits that under the circumstances of this case, at least where the defendant is currently at Wyatt, the exhaustion requirement has been met.

Third, as well known to the Court, Carr suffers from several medical conditions, most notably, a heart condition which requires surgery.  While not necessarily directly covered by the CDC's list of conditions increasing the risk of an individual suffering severe illness should he contract COVID-19, *see* CDC, *Coronavirus Disease 2019 (COVID-19)*, https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited February 17, 2021), the Government agrees that suffering from this condition in an institutional environment during the COVID-19 pandemic could constitute an "extraordinary and compelling" reason warranting compassionate release.  However, as equally well known to the Court, Carr was offered – and declined – his needed surgery through Brigham and Women's Hospital; indeed, he was scheduled for surgery and cancelled it.   Wyatt has also offered to vaccinate Carr from COVID-19 but Carr has declined..

In any event, based on Carr's conduct in this case – including distributing substantial quantities of narcotics and attempting to obstruct justice – and his horrific criminal record – including multiple criminal convictions in federal and state court for crimes of violence, firearms' offenses and narcotics trafficking, and repeated violations of conditions of release – it is  clear that under Section 3553(a), Carr continues to present a clear and present danger to the community and should not be

2

granted compassionate release.

Accordingly, in light of the information available, the government submits that the defendant's motion should be denied..

## I.   BACKGROUND

### A.   Offense Conduct

While recently discussed with the Court in connection with Carr's sentencing some two months ago, for the record, the Government briefly outlines the defendant's conduct.

The facts of this offense are summarized at paragraphs 8-26 of the Presentence Report ("PSR").

### 1.   Investigation Overview

This case arose as part of a larger investigation, code-named Operation Fantasy Island, and subsequent prosecution of drug trafficking and violent crimes committed by members and former members of the Island Brothers street gang in New Haven.  The investigation was coordinated by the Federal Bureau of Investigation ("FBI"), in partnership with state and local law enforcement agencies, all members of the Safe Streets Task Force.  It ultimately resulted in the indictment of 27 individuals.

The investigation began with the gathering of intelligence and surveillance (including via law enforcement physical surveillance and fixed video surveillance).  In early 2019, Task Force members arranged for several controlled purchases of narcotics (in particular, crack cocaine) from the leader of the drug trafficking operation ("DTO"), Samuel Galberth, and his close associate, Tommy Julius.  On the basis of the controlled purchases and consensually monitored phone calls, investigators initially identified two phone numbers used by the DTO:  Galberth's phone and a "work" phone that was used by Julius and other members of the conspiracy to conduct drug transactions.

3

### 2. Carr's Involvement

The investigation eventually led to two telephones utilized by Frank Carr, who has been identified as a source of cocaine for the Galberth DTO. Information developed during the investigation disclosed that Carr provided a kilogram of cocaine to Galberth in March 2019 in the vicinity of Carr's place of business on Connolly Parkway in Hamden. (Count One).

Additional evidence developed during the course of the investigation revealed that Galberth stopped dealing with Carr after that transaction. To that end, while there were communications from November 13, 2018, up to the commencement of the wiretap between telephones believed to be associated with Carr and Galberth, the investigators have not identified communications intercepted between the two after the wiretap was initiated. Specifically, before Title III interceptions commenced on March 15, 2019, there were some 14 calls between the telephones associated with Galberth and Carr, and there were two calls on April 15, 2019, though those calls had no audio.

The FBI analyzed Galberth's movements via cell tower information associated with his telephone, as well as call detail records and pole camera footage from March 15, 2019, the date of communications between the two telephones. *See* Government's Sentencing Memorandum, Exhibit 1 (Doc. 1584-1). The pole camera was focused on the hub of the Galberth DTO's operation (Vivid Imagination's Event Hall located at 1390 State Street, New Haven, Connecticut) and shows, earlier in the day on March 15, 2019, a cooperating witness (who has reported seeing Carr provide Galberth with a kilogram of cocaine) with Galberth. Pen register and call detail records further establish that telephones associated with Carr and Galberth were in contact with one another in the early evening (and there were no further contacts between the telephones associated with the cooperating witness and Galberth during that same time-period). Finally, the cell tower coverage for the location where the kilogram transaction is alleged to have occurred (as well as for 60 Connolly Parkway, where the confidential human source ("CHS") obtained drugs and from which narcotics paraphernalia was

seized on July 10, 2019) is consistent with the location of Galberth's telephone from approximately shortly after 7:00 p.m. until shortly before 7:45 p.m.  Thereafter, Galberth's telephone traveled to a location which had been identified as a location where Galberth was believed  to have stored and processed cocaine into cocaine base.

In addition, a month later, on May 15, 2019, Target Telephone 7 (used by Carr) placed an outgoing call to (203) 390-8933, which was being utilized by Jeffrey Brazier.  After the parties exchanged greetings, Carr stated, "The 'eagle' landed."  Brazier acknowledged the statement and then stated, "What's the, what's the number," to which Carr replied, "Yeah, know what I'm saying, I went and bought the whole, I almost bought the whole [unintelligible]."  Carr and Brazier then discussed an unknown male for the rest of the telephone call.  Based on this call, the Government believes that Carr had received a kilogram of cocaine because the reference to an "eagle" is a code for a kilogram, and when Carr reiterates that he bought, or almost bought the whole thing, he is referring to an entire kilogram.  It is noted that during the May 23, 2019 CHS buy referenced below, Carr had reached out to Brazier to cook the cocaine into crack but Brazier was unavailable to do so.

The investigation also revealed that Carr was selling narcotics to others in addition to the FBI CHS discussed below, which included evidence ranging from the redistribution of ounce quantities of cocaine to the sale of retail quantities of crack and heroin.

With respect to a retail customer, for example, on June 12, 2019, calls were intercepted over Carr's telephone with a regular retail customer who had been in frequent contact with Carr during the wiretap.  Surveillance officers observed the customer arrive in a vehicle at the parking lot of Carr's restaurant (Mama Rosa's II at Derby Avenue in New Haven) and enter the restaurant.  The customer exited a short time later and drove away.

A walled-off stop was conducted with respect to the customer.  The officers recovered four bags containing a total 0.100 grams in net weight of Fentanyl and a Ziploc bag containing 0.152

grams in net weight of cocaine base.

The customer was subsequently interviewed by law enforcement and advised that he/she was a heroin user and had met Carr approximately a year earlier, at which time he/she began buying heroin from Carr.  The customer also, on occasion, bought crack from Carr.  According to the customer, he/she purchased $50 of heroin approximately every other day from Carr.  When he/she purchased crack (which the customer confirmed on a telephone call was referred to as "hard") from Carr, he/she would pay $20 a bag.  (Count Six).  *See* Government's Sentencing Memorandum, Exhibit 2 (Doc. 1584-3).[1]

Independent of the investigation, an individual ("CHS") approached the FBI and stated that he/she could purchase drugs from Carr.  To that end, the CHS made four controlled purchases of narcotics from Carr (Counts Two through Five), one of which is the count of conviction (Count Four).

Count Four charged the controlled purchase that occurred on May 23, 2019.  With respect to that controlled purchase, the agents formulated a plan to purchase $3,000 of crack from Carr.  At about 12:33 p.m., the CHS called Carr (on speakerphone and recorded).  While Carr did not initially answer the telephone, he called back after a few seconds and instructed the CHS to go to his restaurant.

The CHS went to the restaurant and was observed meeting with Carr outside before going into the restaurant.  The CHS and Carr then came out of the restaurant and began driving to Carr's business address at 60 Connolly Parkway in Hamden.  On the way, however, Carr said that he forgot his keys and returned to Mama Rosa's.  During that timeframe, the CHS provided Carr with money for the purchase of the crack.  Carr was also intercepted over his telephone (TT-7) calling codefendant

---

[1] On May 16, 2019 (two calls), May 20, 2019 (two calls), May 26, 2019 (one call),  May 30, 2019 (one call), June 2, 2019 (three calls), June 6, 2019 (one call), June 10, 2019 (one call), and June 12, 2019 (one call), were intercepted between Carr and the customer.  Those calls discussed meeting or, on a couple of occasions, whether the customer had money).

Jeffrey Brazier and telling him that he wanted him to come to the office since Carr "need[s] a thing done" for him (which was a reference to having Brazier process the cocaine into cocaine base); however, Brazier stated that he was not available.

In any event, the CHS accompanied Carr into Building 12 at 60 Connolly Parkway. According to the CHS and a video of the interaction filmed by the CHS, once inside, Carr broke off a quantity of cocaine from a brick and weighed it. Although video of what occurred was not clear, what the CHS described was consistent with videos from May 1, 2019 and June 6, 2019, which depicted Carr in the Connolly Parkway address with cocaine and discussing narcotics. Carr and the CHS then came outside and Carr said that he needed to process the cocaine for the CHS. Carr returned to his restaurant and the CHS left the area.

At about 3:10 p.m., the CHS again went to the parking lot of Mama Rosa's II where agents observed Carr hand him/her something.

Thereafter, the CHS met with investigators and gave them a bag containing a white plastic baggie with a rock-like substance with a gross weight (with packaging) of 82.5 grams. The DEA Laboratory analysis reflected that the substance was cocaine base with a net weight of 78.2 grams.

A federal search warrant executed at 60 Connolly Parkway on July 10, 2019 resulted in the recovery of, *inter alia*, narcotics paraphernalia including two digital scales, boxes containing empty wax folds, three bottles of the cutting agent Super Inositol, three flip phones, bags and a blender with powdery substances, and a box of .380 caliber ammunition. An additional $2,480 was seized from Carr's residence at 687 Pine Rock Avenue, Hamden, CT.

The DEA laboratory reports reflect that in addition to 78.2 grams of cocaine base purchased by the CHS on May 23, 2019, Carr sold the CHS another 32.95 grams of crack and 57.051 grams of cocaine

In a video recording of the May 6, 2019 transaction (transcript filed as Exhibit 4 to Government's Sentencing Memorandum) (Doc. 1584-5), Carr told the CHS that "I got soft man," referring to powder cocaine, and when the CHS stated that he wanted "hard" (referring to cocaine base/crack cocaine), Carr replied "Okay then we gonna get you hard."  Doc. 1584-5 at 1.  Carr later told the CHS that he had "two eight balls and a whole bunch of soft, I got a key of soft," (*id*. at 2) believed to refer to two sets of 3.5 grams of crack cocaine (as he later refers to the "two ball" of crack) and a kilogram of powder cocaine, and asked if the CHS "want any of that I'm cooking up. . . .  I'm going to make some, I'm gonna cook some up, ya let me call him man," (*id*.) believed to refer to calling an individual to process the cocaine into crack cocaine.  Later in the transcript, Carr notes, "oh, yeah I got heroin too" ( *id*. at 10) and later comments that "[y]ou know dope go with the coke." *Id*. at 12.  Still later, talking about money owed him, Carr told the CHS, "[y]ou only gave me 290, you owe me 1500, you gave me 290, another nigger owes me 4,000, another nigger owes me 11 hundred, you know what I'm saying, I ain't sweating these niggers man.  I ain't sweating." *Id*. at 15.

Carr was arrested on July 10, 2019, and has remained detained since that time.  Since Carr has been detained, investigators have recovered three letters believed to be transmitted by Carr to a codefendant via another inmate in the fall of 2019.  (Count Seven).  Copies of the letters were filed as Exhibit 5 to the Government's Sentencing Memorandum (Doc. 1584-6).

One of those letters contains Carr's fingerprints, and all of the letters have characteristics which suggest that they may have been authored by Carr; however, a definitive analysis of handwriting could not be performed by the FBI's Questioned Documents Unit absent a comparison of the questioned documents with handwriting exemplars taken directly from Carr.

Pursuant to this Court's Order, handwriting exemplars were obtained from Carr and provided to the laboratory.  However, the laboratory was unable to come to a definitive conclusion "[d]ue to characteristics indicative of distortion observed [in the exemplars] which is inconsistent [with other

known writing samples provided by Carr], as well as the presence of unexplained characteristics." As a result, the laboratory's original opinion that the letters "May Have" been written by Carr "remain[ed] unchanged" after reviewing the exemplars.

These letters contained material falsehoods and were designed to obstruct justice by, for example, encouraging the recipient to back Carr's claim that he was not involved in drug dealing. In one letter, Carr told the addressee, "so when you see your lawyer tell him what you been telling him I never gave no drugs to nobody" (which was untrue given his guilty plea to Count Four and the fact that he had supplied drugs to the intended recipient of the letters). In another letter, Carr advised that he "got a plan because somebody need to get out so we can hold each other down."[2]

B.   **Procedural History**

Carr was arrested on July 10, 2019 based on an indictment charging him with various narcotic-related offenses. He moved for bond on August 6, 2019 (Doc. 317), but after the Government filed its response (Doc. 357), Carr withdrew his motion (Doc. 362). On April 13, 2020, Carr moved for release from custody based on his medical conditions. Doc. 945. The Government responded the following day (Doc. 952), and following oral argument (Doc. 959), the Court denied the motion for release. Doc. 962. The Court held that release was not warranted "in light of the defendant's history and characteristics," and that "continued detention is warranted to protect the public from the possibility of further wrongdoing by the defendant." The Court also noted that Carr's medical conditions at that time did not fall within the CDC's category of serious risk.

On May 7, 2020, Carr again moved for release. Doc. 1050. The Government responded the next day. Doc. 1056. On May 27, 2020, the Court again denied the motion. In addition to finding that the defendant had not established compelling reasons justifying release, the Court noted:

---

[2] Based on the letters, the Court assessed the defendant a two-level increase in his guidelines for obstruction of justice pursuant to U.S.S.G. § 3C1.1, overruling the defendants' objections

9

The defendant's history of engaging in criminal conduct while on supervised release, indeed, even participating in support court, is very troubling. Given this history, it is unfortunately the case that the defendant might well revert to criminal history were he released now. To establish a compelling reason justifying his release, despite the risk that he would revert to criminal activity, the defendant must demonstrate that he faces the likelihood of irreparable harm [if] he is not released. He has not made that showing.

Doc. 1100.

On October 5, 2020, the Government filed a Second Offender Information. Doc. 1441. On October 28, 2020, Carr pleaded guilty to Count Four of the Third Superseding Indictment charging him with Possession of 28 Grams or More of Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B). He also admitted violating the terms of supervised release imposed by Judge Thompson as part of his sentence for distributing heroin. Magistrate Judge Robert M. Spector, to whom the matter was referred, recommended that the waiver and guilty plea be accepted by this Court (Doc. 1487), which this Court did by Order Accepting Findings and Recommendation on November 2, 2020 (Doc. 1501).

Carr filed a motion for Order Re: Transfer to a Medical Facility on November 14, 2020 regarding his need to have heart surgery (Doc. 1521) (which largely forms the basis of his instant motion for compassionate release). The Government responded the next day. Doc. 1527. In that response, the Government noted

that Wyatt and the United States Marshals Service ("USMS") arranged for Carr to be seen and evaluated by specialists at Brigham and Woman's Hospital, and that the doctors there recommended that Carr undergo surgery. To that end, the Government further understands that the USMS authorized Carr to undergo the recommended surgery, which was arranged by the Wyatt medical unit and scheduled for October 30, 2020. However, the Government further understands that when Carr was advised that he would be transferred to the hospital for surgery, Carr refused to go. Accordingly, the surgery was cancelled.

Doc. 1527 at 3. The following day, the Court advanced the sentencing from January 22, 2020 to December 12, 2020. Doc. 1530. On November 25, 2020, Carr filed a Second Motion for Order Re: Emergency Order allowing release to home confinement. Doc. 1552.

10

On December 14, 2020, the Court sentenced Carr.  He was sentenced principally on the instant case to 120 months, followed by eight years of supervised release.  The Court also sentenced Carr to a consecutive six-month sentence for violating supervised release in No. 3:12CR53 (RNC).

C.     **Carr's Current Status**

Carr has remained at Wyatt pending transfer to a United States Bureau of Prison facility.  The Government understands that Carr has been designated to FCI Butner by the Bureau of Prisons.  It is the Government's further understanding that Carr's medical records were forwarded to the Bureau of Prisons in connection with that designation and that Carr will have access to the Federal Medical Center at Butner to treat his medical condition(s).  The United States Marshal has advised that the United States Marshals Service has approved  his request that Carr be directly transported to Butner (*i.e.*, either by private plane or commercial flight) rather than through the USMS's ordinary Justice Prisoner and Alien Transportation System,.  The United States Marshal expects that that transfer should occur shortly.

## II.     **LEGAL STANDARD**

A.     **Court's Jurisdiction after Notice of Appeal**

Since Carr's appeal is currently pending (as it was at the time of the defendant's original filing), this Court does not technically have jurisdiction over the defendant's motion for compassionate release.  "The filing of a notice of appeal is an event of jurisdictional significance— it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982).  Although the district court retains the ability to "correct[ ] clerical errors under Fed. R. Crim. P. 36 or [to] act[ ] to aid the appeal," it may not substantively modify judgments.  *United States v. Ransom*, 866 F.2d 574, 575-76 (2d Cir. 1989) (internal quotation marks and citations omitted).

Under Federal Rule of Criminal Procedure 37, in such circumstances, where "a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending," the district court may: "(1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Crim. P. 37(a).   As Judge Bryant has noted:

> Federal Rule of Criminal Procedure 37 anticipates precisely the jurisdictional issue present here. Rule 37 provides, in relevant part, that "[i]f a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may: (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed R. Crim. P. 37(a). "Reflecting this Circuit's longstanding approach, ... this rule allows district courts to deny, but not to grant, a motion for which it lacks jurisdiction due to a pending appeal." *United States v. Martin*, No. 18-CR-834-7 (PAE), 2020 WL 1819961, at *2 (S.D.N.Y. Apr. 10, 2020).

*United States v. Shabazz,* 2020 WL 4381944 at *3 (D. Conn. Jul. 31, 2020). (holding that district court lacked jurisdiction to decide defendant's compassionate release motion while appeal was pending);  *United States v. Heyward*, 15-CR-445 (PAE), 2020 WL 3872148, at *2 (S.D.N.Y.  Nov. 21, 2019)*United States v. Jordan*, No. 18-CR-834-2 (PAE), 2020 WL 3839629, at *2 (S.D.N.Y. July 8, 2020) (same); *United States v. Moseley*, No. 16 CRIM. 79 (ER), 2020 WL 1911217, at *1 (S.D.N.Y. Apr. 20, 2020) (no jurisdiction over compassionate release motion based on COVID-19 pandemic because of pending appeal, and stating that "[a]bsent further factual development, the Court cannot say whether it would ultimately grant the motion if the case were remanded for such purposes, but neither is it willing to deny the motion outright.  These are complex and time-sensitive issues, but they are ones that the Court can only take up if the Second Circuit agrees it would be useful to decide the instant motion before it decides the appeal."); *United States v. Vigna*, No. S1 16-CR-786-3 (NSR), 2020 WL 1900495, at *3 (S.D.N.Y. Apr. 17, 2020) (finding same regarding jurisdiction, but deciding not to issue indicative ruling because defendant had not exhausted administrative remedies); *United States v. Morris*, No. 11-CR-912 (JFK), 2020 WL 6781063, at *2-

3 (S.D.N.Y. Nov. 18, 2020) (finding same regarding jurisdiction but "in the interests of judicial economy" denying motion on merits under Rule 37).

Under Rule 37, a defendant "must promptly notify the circuit clerk under Federal Rule of Appellate Procedure 12.1 if the district court states that it would grant the motion or that the motion raises a substantial issue."  An advisory committee note lists "motions under 18 U.S.C. § 3582(c)" as one of three types of motions for which the drafters "anticipate[ ] that Criminal Rule 37 will be used primarily if not exclusively."  Fed. R. Crim. P. 37 advisory committee's note (2012).

Recently, since the COVID-19 pandemic, courts have invoked Rule 37 to either defer or deny motions for compassionate release, or to issue indicative rulings that the courts would grant the motion on remand.  *See, e.g.*, *United States v. Page,* 2020 WL 7258034 (D. Conn.  Dec. 10, 2020) (issuing indicative ruling under Rule 37(a)(3) to time served where defendant has medical conditions, had served about 43% of his sentence, and given defendant's personal growth and change of outlook); *United States v. Shabazz,* 2020 WL 4381944 at *3 (denying motion while appeal pending); *United States v. Morris*, 2020 WL 6781063, at *2-3 (S.D.N.Y. Nov. 18, 2020) (finding same regarding jurisdiction but "in the interests of judicial economy" denying motion on merits under Rule 37); *United States v. Heyward*, 2020 WL 3872148, at *2 (S.D.N.Y.  Nov. 21, 2019) (same).

.B.     **Compassionate Release under 18 U.S.C. § 3582**

Federal law allows a court to grant a "compassionate release" motion to reduce a federal prisoner's sentence for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A)(i). While previously it was only the Federal Bureau of Prisons that could file this kind of motion, Congress amended the law with the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), to allow prisoners the right to file their own motions for a sentence reduction if they first exhaust the statute's procedures for initially making a request to the warden to file a motion on their behalf.  *See United States v. Hill*, 2020 WL 2542725, at *1 (D. Conn. May 19, 2020).

Title 18, United States Code, Section 3582(c)(1)(A), as amended, authorizes courts to modify terms of imprisonment as follows:

> [T]he court ... upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that ... extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

The Second Circuit has held that pursuant to this section, as modified by the First Step Act of 2018, the Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [the court] in motions for compassionate release." *United States v. Brooker*, 976 F.2d 226, 237 (2d Cir. 2020) ("Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion."). Accordingly, because the defendant – and not the Bureau of Prisons ("BOP") – brings the instant motion, the Court is not bound by the Sentencing Commission's outdated policy statement applicable to Section 3582(c)(1)(A), *see* U.S.S.G. § 1B1.13, which the Second Circuit recognized as only applying to motions for sentence reduction brought by the BOP. *Brooker*, 976 F.3d at 236 ("hold[ing] that Application Note 1(D) does not apply to compassionate release motions brought directly to the court by a defendant under the First Step Act ..."; rather, this Guideline "only [applies] to those motions that the BOP has made" under this Act). However, "[r]ehabilitation ... *alone* shall not be considered an extraordinary and compelling reason." 976 F.3d at 238 (citing 28 U.S.C. § 994(t)) (emphasis in original); *see also* 28 U.S.C. § 994(t) ("[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

In any event, beyond a court's determination as to whether there exist "extraordinary and

14

compelling reasons" for a sentence reduction, a court must also "consider[ ] the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable."   18 U.S.C. § 3582(c)(1)(A). Therefore, in deciding a compassionate release motion, a court must examine the same factors it did when it initially sentenced the defendant, including the nature and circumstances of the crime, the defendant's history and characteristics, and the multiple purposes of sentencing, such as providing just punishment, deterring crime, protecting the public from further crimes by the defendant, and providing the defendant with rehabilitation.  *See* 18 U.S.C. § 3553(a).  "The defendant has the burden to show he is entitled to a sentence reduction."  *United States v. Gagne*, 451 F. Supp. 2d 330, 334 (D. Conn. 2020); *see also United States v. Belle*, 2020 WL 2129412, at *2 (D. Conn. May 5, 2020) (citations omitted).

Accordingly, the Court may issue an indicative ruling reducing Carr's term of imprisonment if (1) he has fully exhausted his administrative remedies or 30 days have passed from receipt of his request by the Warden, and (2) it finds, after considering the Section 3553(a) factors, that "extraordinary and compelling reasons warrant" a reduction of his term of imprisonment.

## III.    **DISCUSSION**

### A.    <u>Currently, the Court Lacks Jurisdiction to Grant Carr's Motion</u>

As an initial matter, because Carr has appealed his sentence in this case to the Second Circuit, *United States v. Carr*, 20-4270 (2d Cir.), the Court lacks jurisdiction to grant the defendant's motion for compassionate release.  *See, e.g.*, *Griggs*, 459 U.S. at 58; *Ransom*, 866 F.2d at 575-76; *Heyward*, 2020 WL 3872148, at *2.  However, as noted, under Rule 37(a), the Court can defer ruling on the motion, deny the motion, or make an indicative ruling either that it would grant the motion if the Second Circuit were to remand or that the motion raises a substantial issue.

For the reasons stated below, the Government respectfully submits that in the interests of judicial economy, the Court should deny the defendant's motion pursuant to Fed. R. Crim. P.

37(a)(2).

B. **The Government Does Not Argue that Carr has Not Exhausted Administrative Remedies**

A prerequisite to any request for compassionate release under Section 3582(c)(1)(A) requires a defendant to either fully exhaust all of the BOP's administrative appeal requirements or, in the alternative, to wait for 30 days after seeking relief from the prison warden before filing a motion for release with the court. Under the circumstances, as Carr is not yet at a Bureau of Prisons facility and the Warden at Wyatt would be unable to grant his request for compassionate release, the Government believes that Carr's motion may be considered by the Court if it chooses to do so at this time.

C. **Extraordinary and Compelling Reasons**

The Center for Disease Control has stated that persons of any age with certain conditions are at increased risk of severe illness from COVID-19: cancer, chronic kidney disease, COPD (chronic obstructive pulmonary disease), heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies, immunocompromised state from solid organ transplant, obesity (body mass index [BMI] of 30 or higher but under 40), severe obesity (BMI greater than 40), pregnancy, sickle cell disease, smoking, and Type 2 diabetes mellitus. Centers for Disease Control and Prevention, *People with Certain Medical Conditions*,https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Feb. 17, 2021). The CDC also advises that the following conditions *may* increase the risk for severe illness from COVID-19: asthma (moderate-to-severe), cerebrovascular disease, cystic fibrosis, hypertension or high blood pressure, immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines, neurologic conditions (such as dementia), liver disease, overweight (BMI > 25, but < 30), pulmonary fibrosis (having damaged or scarred lung tissues), thalassemia, and Type 1 diabetes mellitus. *Id.* Moreover, "[a]mong adults, the

16

risk for severe illness from COVID-19 increases with age, with older adults at highest risk." Centers for Disease Control and Prevention, *Older Adults*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed Feb. 17, 2021).

Assuming, *arguendo*, the Court acts on the defendant's motion at this time, the medical records earlier supplied by the defendant support that Carr has a heart condition (Aortic Stenosis) which the Government believes the CDC would recognize as placing him at an increased risk from COVID-19. *See* Centers for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed Feb. 17, 2021). The Government understands from reports earlier submitted by the defendant that this condition will require surgery. Moreover, he suffers from hypertension which may increase his risk should he contract COVID-19. *See* PSR ¶¶ 81-82.

To the Government's understanding, Carr's records were sent to the Bureau of Prisons in connection with their determination of designation. Carr has been designated to Butner where he will be able to receive medical treatment for his conditions, including Aortic Stenosis.

Carr complains at pages 2-3 of his Memorandum that he was not designated and moved more quickly. In this connection, at the Court's request prior to sentencing, the Government checked with the Bureau of Prisons and advised the Court by email dated December 2, 2020, that the designation unit was unaware of any instance where the BOP has designated an inmate before sentencing. It advised  that inmates with medical concerns are designated by medical designators. Medical designators make designations based on urgency of need; cost-effectiveness; institution capabilities; expected service period, including recuperation; current bed space availability; security; and changes in medical condition. After review, the medical designator will designate Carr to a facility, which may be a medical center or a mainline institution that can provide appropriate medical care and treatment in the community. The records have been received by the Bureau of Prisons and Carr has

been designated to a complex with a medical facility which includes a hospital.[3]

It is noteworthy, as referenced above, that Wyatt and the United States Marshals Service arranged for Carr to be seen and evaluated by specialists at Brigham and Women's Hospital, and that the physicians there recommended that Carr undergo surgery for an aortic valve replacement. The USMS received authorization for Carr to undergo the recommended surgery, which was arranged by the Wyatt medical unit and scheduled for October 30, 2020. However, when Carr was advised that he would be transferred to the hospital for surgery, he refused to go. Accordingly, the surgery was cancelled.

In response to Carr's arguments at pages 5-7 of his Supplemental Memorandum regarding the Covid-19 pandemic, the Government notes that according to information received from Wyatt's Health Services Administrator this morning, on February 8, 2021, Carr was offered Covid-19 vaccine. Carr read the CDC guidelines which did not state that there were any contraindications regarding his condition, and Edward Blanchette, M.D., who is Board Certified in infectious diseases, personally urged Carr to be vaccinated. Carr advised that he wanted to discuss the vaccine with his cardiologist and did not want to vaccinated at that time.

---

[3] The cases cited by Carr as pages 3-5 of his Supplemental Memorandum are readily distinguishable. Unlike Carr, the defendant in *United States v. Martin*, No. 19:CR260 (JAM), had no criminal record, had only a few months left on his firearms' dealing sentence of a year and a day, and was not receiving the surgery he needed while in BOP custody,. Carr, on the other hand, rejected having surgery and is being designated to a facility based on his medical condition. Similarly, the defendant in *United States v. Alamontes*, 2020 WL 1812713 (D. Conn. Apr. 9, 2020), was a Danbury FCI where he was not receiving treatment for his condition as opposed to a medical facility where his medical issue could be addressed, 2020 WL 1812713 at *7. Moreover, Alamonte had served more than 15-years' incarceration and had "fully rehabilitated himself in prison and is poised to become a productive member of society. *Id*. at *8. The same can hardly be said of Carr who has served only about 19-months of his 126 month sentence and, as discussed below, continues to pose a risk to the community. And, unlike Carr, the defendant in *United States v. Beck*, 425 F. Supp.3d 573, 585 (M.D.N.C. 2019), had served over six years with two-years of that having breast cancer which had remained untreated, and the Section 3553(a) factor, taken as a whole, favored release which, with conditions, could ensure the safety of the community.

1.    **Wyatt**

In its most recently filed Status Report to the United States District Court for the District of Rhode Island on February 16, 2021, Wyatt reported having no active cases of COVID-19 among the detainee population (and five among staff).  *See In re Donald W. Wyatt Detention Facility*, No. 1:20-MC-4 (JJM), Status Report, Doc. 94 (D. R.I. Feb. 16, 2021).  As the Court well knows, Wyatt has instituted protocols to ameliorate the spread of COVID-19 at the facility (*see* Attachments A, B and C to Status Report), and has begun to vaccinate both staff 106 first dose and 51 second dose) and detainees (11 detainees given first dose).

2.    **Butner**

The Government understands that the institution follows guidelines set forth by the Centers for Disease Control and the policies and procedures mandated by the Federal Bureau of Prisons.  *See* https://www.bop.gov/coronavirus/covid19_status.jsp (BOP Modified Operations) (Nov. 25, 2020, last accessed Feb. 17. 2021);   https://www.bop.gov/coronavirus/overview.jsp#bop_emergency_response (BOP Emergency Response) (last accessed Feb. 17, 2021).  Vaccinations have commenced within the Bureau of Prisons, with 575 staff and 485 inmates having been fully vaccinated within the Butner Correctional Complex.  *See* https://www.bop.gov/coronavirus/index.jsp (last accessed Feb. 17, 2021).  Within the Butner complex, the Bureau of Prisons website currently reports: Butner Medium II FCI reports 61 active cases among inmates and four among staff, and 334 inmates recovered; Butner Medical Center reports one active case among inmates and seven among staff, and 155 inmates recovered; Butner Low FCI reports no active cases among inmate with four among staff, and 578 inmates recovered;  and Butner Medium I FCI reports no active cases among inmates with five among staff, and 159 inmates recovered; and Butner Low FCI reports no active cases among inmates and four among staff, with 578 inmates recovered.

https://www.bop.gov/coronavirus/index.jsp (last accessed Feb. 18, 2021)

D.     **Section 3553(a) Factors**

In the Government's view, given all of the factors outlined in Section 3553(a), the defendant should not be granted compassionate release as he has only served a little more than a year and one-half of this Court's 126 month sentence. This limited amount of time certainly does not begin to satisfy the factors which the Court sought to address when imposing a sentence of 126 months incarceration.

First, the nature and circumstances of the offense are very serious. Carr sold crack cocaine to a cooperating witness and the evidence reflects that this sale was not an isolated case. In fact, from May 1, 2019 to June 6, 2019, Carr sold over 111 grams of crack/cocaine base and over 57 grams of cocaine hydrochloride to that cooperating witness. In addition, there is evidence that Carr sold cocaine to others including Samuel Galberth, and possessed kilogram quantities of cocaine as well. Finally, there is evidence that he had regular customers to whom he sold drugs on a regular basis. In other words, Carr was an experienced, prolific, and substantial drug trafficker. Moreover, when faced with these charges, Carr attempted to obstruct justice by having a codefendant concoct a yarn to exculpate him. An effective 19-month sentence is plainly inadequate to provide just punishment for the offense, promote respect for the law, and reflect the seriousness of the offense.[4]

As to the defendant's history and characteristics, Carr's criminal record can only be described as serious, long, and unremitting. The "highlights" are detailed below

- On July 15, 1983, Carr and two other individuals were involved in an attempted armed robbery at a motel and an armed robbery of a Kwik-Pic store in New Haven, involving the use of a sawed-off shotgun. On or about July 19, 1983, Carr was arrested on a weapons charge and admitted his involvement in the July 15, 1983 attempted armed robbery and armed robbery. Carr was sentenced on October 21, 1983 to an effective

---

[4] Assuming Carr receives good-time credit, the Government calculates that he will be released on June 10, 2028, meaning that he has only served approximately 18 percent of his sentence.

sentence of eight years' imprisonment, suspended after four years served, and five years' probation, which was modified on August 2, 1985, to eight years' imprisonment, suspended after three and one-half years.  PSR ¶¶ 44-45.

- Carr was released from custody on October 12, 1985 and placed on probation.  PSR ¶ 45.  Not even two months later, on December 8, 1985, Carr was arrested for possession of a weapon in a motor vehicle.  PSR ¶ 46.  On November 9, 1986, he was arrested for possession of narcotics for an offense that had occurred on May 26, 1986.  PSR ¶ 47.  In January 1987, he was sentenced to an effective sentence of two years' imprisonment for the weapons possession charge, three years' imprisonment concurrent for the narcotics charge, and four years' imprisonment on the probation violation.  PSR ¶ 47.  His probation was also revoked at that time.  On February 1, 1988, Carr was released to a halfway house and on June 22, 1988, was placed on supervised parole.  He was returned to custody on a parole violation on January 13, 1989, and released to a community halfway house on April 17, 1989.  He escaped from the halfway house on May 20, 1989, and returned to custody on February 1, 1990.  PSR ¶ 44.

- On February 1, 1990, Carr was arrested for criminal possession of a weapon, possessing a pistol without a permit, and interfering, as well as assault in the third degree.  In that case, officers saw Carr on the street and, knowing he had a warrant, attempted to stop him.  Carr ran from the police and, when caught, struggled with the officers.  During the struggle, Carr reached for a firearm in his waistband; however, officers were able to place him into custody before he was able to remove the firearm.  The firearm was a semi-automatic pistol with 11 hollow-point rounds in the magazine and one in the chamber.  After his arrest, Carr threatened the arresting officers asserting that he was going to get back at them by doing harm to them.  He was held in custody that date and was subsequently sentenced to five years' imprisonment, suspended after three years.  PSR ¶ 51.  He was also sentenced to a consecutive two-year suspended sentence, and five years of probation on the escape conviction. PSR ¶ 53.

- On October 19, 1990, Carr was sentenced to a consecutive one-year term of incarceration for Reckless Endangerment in the First Degree, arising out of a January 21, 1990 incident.  In that case, a victim reported getting into a verbal altercation with Carr which led to Carr placing a firearm into the victim's stomach and threatening to shoot him.  Later that same early morning, the victim advised that Carr again accosted him and put a firearm to his head, threatening to kill him.  The victim reported that in the early afternoon, Carr fired several shots at him (according to the defendant, the victim first shot at him and he only returned fire).  PSR ¶ 52.  Carr remained in custody from February 1, 1990 until he was released on state parole on July 13, 1992.  He was returned to custody with new charges on February 23, 1993, and released again to parole on February 15, 1995.

- Some four months later, on June 12, 1995, Carr was arrested for threatening to shoot a victim on May 30, 1995.  (PSR ¶ 54).  He was arrested again on November 15, 1995,

for threatening when he showed the victim a firearm.  PSR ¶ 55.  The arrest which led to his federal conviction arose out of an incident on November 14, 1995, when police responded to a report of a man with a firearm.  When the police arrived, they saw the defendant, who began to run away and discarded a loaded semi-automatic pistol.  Carr was arrested on state charges, which were adopted federally.  *United States v. Frank Carr*, Case No. 3:96CR69 (AVC).  PSR ¶ 58.

- On December 27, 1995, Carr was arrested for murder arising out of a double shooting of two brothers the previous day, one of them fatally.  Carr was identified as the shooter and was himself treated at the hospital for gunshot wounds arising out of the shootout with the brothers.  On January 24, 1997, Carr was sentenced on his plea to Manslaughter in the First Degree to 20 years of imprisonment, suspended after 10 years, with five years' probation.  PSR ¶ 57.  In the interim, on December 23, 1996, Carr was sentenced by Judge Covello to 60 months imprisonment, followed by three years of supervised release, on the federal firearms charge.  PSR ¶ 584.

- Carr was released to parole on November 22, 2004, and returned to custody with a sale of narcotics charge arising out of his possession of 50 bags of heroin less than three months later on February 12, 2005.  He was convicted of that charge on June 30, 2005, and sentenced to three years of imprisonment.  PSR ¶ 59.  Judge Covello also revoked his supervised release on July 1, 2005, and sentenced him to 24 months of imprisonment.  PSR ¶ 58.  Carr was discharged from custody on August 24, 2011, and placed on probation on the Manslaughter conviction.  PSR ¶ 57.

- On or about November 20, 2011, November 28, 2011, and December 22, 2011, an NHPD cooperating witness made controlled purchases of street distribution quantities of heroin from Carr.  On or about February 23, 2012 law enforcement received information that Carr and another individual would be returning by train from New York after being resupplied with heroin.  The next day, officers observed Carr and another man arrive by train and enter a car.  The agents then stopped Carr and another individual in a car, and recovered a backpack with 1,840 baggies of heroin with a net weight of 66.9 grams, along with four cellular telephones and $3,074 in U.S. currency.  Carr was arrested and charged federally on March 8, 2012.  *See* No. 3:12CR53 (AWT).

- On July 2, 2012, Carr pleaded guilty to a substitute information charging him with possession with intent to distribute and the distribution of heroin, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C), and was sentenced by Judge Thompson on January 2, 2013, to 63 months of imprisonment (the bottom of the applicable sentencing guideline range), followed by five years of supervised release.  On May 13, 2015, Carr's sentence was reduced to 51 months' imprisonment, pursuant to 18 U.S.C. § 3582(c)(2).

- Carr began his term of federal supervised release on or about November 16, 2015.  On June 28, 2017, Judge Thompson reduced Carr's period of supervised release by a year, to expire on November 15, 2019, since (at least to the Court's knowledge) Carr had

successfully completed the Support Court program.

In summary, Carr has sustained some 10 adult felony convictions including separate federal convictions for possession of a firearm by a convicted felon and possession of heroin with intent to distribute.  He has state convictions for Manslaughter in the First Degree with a Firearm, Robbery and Attempted Robbery in the First Degree, two convictions for possession of a weapon, and a state conviction for sale of a controlled substance.  In addition, Carr has a conviction for Reckless Endangerment in the First Degree arising out of his threating another person with a firearm and later shooting at him, and two threatening convictions in which the victims stated that Carr threatened them with a firearm.  He has violated supervised release, parole, and probation, and absconded from a halfway house resulting in an escape conviction.  Since his release from custody on his robbery convictions in 1985, the Government has calculated that Carr has spent approximately 23 years in custody and another 257 days on escape status.  The longest period he has remained in the community was about 4.652 years while on supervised release from his prior federal drug conviction, during at least a portion of which he was involved in drug trafficking.  Yet neither his criminal convictions nor time in custody nor periods of judicial supervision has deterred him from continued criminal activity. Moreover, even while detained in this case, Carr attempted to obstruct justice by trying to get a codefendant to concoct evidence.

The Government also notes that a box of ammunition was recovered from 60 Connolly Parkway, Carr's office address.  Although no firearm was recovered and the Government was not able to link the ammunition directly to Carr, his record of convictions for crimes of  violence,

including a manslaughter with a firearm conviction, and several convictions involving possession of

a firearm, the location of this ammunition at Carr's office address creates significant concerns.

Carr's recorded statement from May 1, 2019 (less than two months before his arrest in this

case and less than two years ago) to the CHS in which he discusses what appears to have been a prior

dispute over drug territory in which he displayed a firearm, is troubling:

> I used to stay at the Scripts, I had the projects fucked up, you know the projects right across
> from Rutgers, right?  They got some projects right across from Rutgers.  I was in there, I had
> 2 brothers, I was in there killing them, I came down there with a bird and the niggas ran up
> on me, about 10 niggas.  I went down there with my man Virgil, them niggas, I had 2 niggas
> down with me and I had the gun, some niggas ran up on me and was like what's up man who
> are you.  We won't hurt you people, but like man we aint got no problem with you but you
> stopping this flow
>
> * * *
>
> He say yeah we ain't go no problem with you, I got my burner out.  I'm like nigga I'm goin
> out with a blaze I don't give a fuck. Nigga, you know what I'm saying?  We goin to go out
> together.

*See* Government's Sentencing Memorandum, Exhibit 4 at 5 (Doc. 1584-5).

Further, this Court should reject Carr's request for compassionate release to deter him and

protect the community.   Apart from Carr's proven age-defying track record for recidivism

culminating in his commission of serious drug and attempted obstruction offenses in his early 50s,

the PSR scored him with 14 criminal history points which placed him in Criminal History Category

VI.  This is without counting a number of his convictions including for Robbery in the First Degree,

Attempted Robbery in the First Degree, Weapon in a Motor Vehicle, Possession of Narcotics,

Carrying a Pistol without a Permit, Reckless Endangerment in the First Degree, and Escape in the

First Degree.  The United States Sentencing Commission has found that defendants who were in

Criminal History Category VI at the time of their sentencing who were released after 60 years old,

faced a re-arrest rate of 37.7 percent.  *See* United States Sentencing Commission, *The Effects of Aging*

*on    Recidivism    Among    Federal    Defendants*    (Dec.    2017)    (accessed    at

24

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf#page=9. [5]

Finally, the Government notes that Section 3553(a) requires the Court to consider the need to avoid unwarranted sentencing disparities among similarly situated defendants.  This, of course, is an imprecise exercise given the unique characteristics of each defendant.  That having been said, another supplier to the Galberth organization with a similarly age defying criminal record, Brian Backman, was denied compassionate release by this Court.  While Backman had already been infected with and recovered from COVID-19, the Court found that "[e]ven if Mr. Backman were able to make that showing [that although he has had the virus and showed no symptoms, he still faces a high risk of severe illness if he remains incarcerated], he could not obtain compassionate release under the statute unless he also demonstrated that he no longer poses a danger to the community and, in addition, that reducing his sentence would be consistent with the purposes of a criminal sentence set forth in s 3553(a)(2).  As the Government correctly argues, Mr. Backman appears to pose a high risk of returning to drug trafficking and the record provides no support for a lesser sentence than the sentence of 121 months imposed just 6 months ago."  Doc. 1346.  In the Government's view, those findings apply with equal force to Carr who was sentenced by this Court to 126 months a little over two months ago.  On the flip side, a sentence of approximately 19-months would place Carr at the lower-end of the sentences that this Court has imposed in this case.

---

[5] Carr claims at page 8 of his Memorandum that "ability to commit future offenses would be seriously hindered by his serious heart issues as he ages."  That contention is unsupported especially once he agrees to receive the needed treatment.  The defendant's *pro s* motion at 2-3 suggests a location where he can rehabilitate after surgery, he does not indicate when and where that surgery would occur.  Moreover, and in any event, given the defendant's conduct during his previous periods of court-authorized supervision – and indeed, while detained in this case-- there  is no reason to believe that he would comply with conditions if released.

IV.    **CONCLUSION**

The defendant's health records document that he has conditions which meet the criteria allowing for consideration of a compassionate release request.  Accordingly, although it is presently without jurisdiction to consider the motion, the Court has discretion to determine, based on the § 3553(a) factors, whether a reduction in Carr's sentence would be appropriate.  However, for the reasons outlined above, the Section 3553(a) factors overwhelming tip in favor of denying the motion.  Accordingly, the Government respectfully submits that the defendant's motion for compassionate release should be denied.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ Anthony E. Kaplan*
ANTHONY E. KAPLAN
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct08083
157 Church Street, Fl. 25
New Haven, Connecticut 06510
Tel: (203) 821-3700
Anthony.kaplan @usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on February 18, 2021, a copy of the foregoing Government's Response was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Anthony E. Kaplan*
ANTHONY E. KAPLAN
ASSISTANT UNITED STATES ATTORNEY